John Hendrickson, Appellant, *v.* Samuel J. Hodkin et al., Defendants, and Park East Operating Corporation, Respondent.

Argued October 7, 1937; decided December 7, 1937.

*Eugene L. Bondy* and *Norman Winer* for appellant. The plaintiff proved a good cause of action against the defendant-respondent as a joint tort feasor with its codefendants. (*McQuade* v. *Stoneham*, 263 N. Y. 323; *Tandy* v. *Prudential Ins. Co.*, 240 App. Div. 709; 263 N. Y. 541; *Martindale* v. *State*, 269 N. Y. 554; *Schloendorff* v. *New York Hospital*, 211 N. Y. 125; *Robertson* v. *Towns Hospital*, 178 App. Div. 285; *Green* v. *Biggs*, 167 N. C. 417; *Wetzel* v. *Omaha Hospital Assn.*, 96 Neb. 636; *Tulsa Hospital Assn.* v. *Juby*, 71 Okla. 105; *Vannah* v. *Hart*, 228 Mass. 132; *Sanatorium* v. *Scruggs*, 121 Miss. 330; *Meyer* v. *McNutt Hospital,* 173 Cal. 156; *Hornstein* v. *Podwitz*, 254 N. Y. 443; *County Plains Corp.* v. *Nosband Corp.*, 234 App. Div. 588; *Green* v. *Davies*, 182 N. Y. 499.)

*Leo Fixler* for respondent. Dismissal of the complaint by the Appellate Division was proper. (*Brown* v. *Shyne*, 242 N. Y. 176; *Schmidt* v. *Merchants' Dispatch Transp. Co.*, 270 N. Y. 287; *Stern* v. *Great Island Corp.*, 250 App. Div. 115; *Karpeles* v. *Heine*, 227 N. Y. 74; *Corwin* v. *N. Y. Erie R. R. Co.*, 13 N. Y. 42; *Matter of Brown* v. *St. Vincent's Hospital*, 222 App. Div. 402; *Matter of Renouf* v. *N. Y. C. R. R. Co.*, 254 N. Y. 349; *Schloendorff* v. *N. Y. Hospital*, 211 N. Y. 125; *Phillips* v. *Buffalo Gen. Hospital*, 239 N. Y. 188; *Mills* v. *Society of N. Y. Hospital*, 242 App. Div. 245; 270 N. Y. 594.)

HUBBS, J. The respondent Park East Operating Corporation is a private hospital operated for profit. The question involved relates to the duty which it owed to appellant, a patient. Appellant, a truck driver, had a sore on his lower lip for which he had received treatment at various hospitals, but it continued to trouble him. He heard of the defendant Rigley, who had been a

chauffeur and also sold ointments to cure skin diseases. In 1933 Rigley returned to Ireland, his native country. On his return to New York he brought back an old remedy for the cure of cancer which had been used in his family for two hundred years; also Irish newspaper accounts of cures made by the use of the salve. Rigley arranged a meeting with appellant at the home of a man named Smith. He showed appellant Irish newspapers containing accounts of cures made by the use of the salve. He stated that he had cured a cancer on Smith's face and showed him a bottle which he said contained the cancer removed from Smith's face. He told appellant that the sore on his lip was just a crab and said he could cure it in thirty-one days. It does not appear that Smith ever suffered from a cancer. Two other meetings took place at which Rigley tried to persuade appellant to try the cure. At the third meeting appellant's brother, who was expected to furnish the money to pay for the treatment, was present, and he told appellant he would not be a party to the matter unless a doctor approved and supervised the treatment. Appellant then told Rigley that he insisted upon having a doctor. A doctor, who was a relative of appellant, was called in, but he advised against any treatment except at a hospital and under a physician's supervision. Later Rigley telephoned appellant that he had secured a doctor and thereafter he took appellant to the office of the defendant, Dr. Hodkin, whom appellant had never met before. The doctor, after giving appellant a superficial examination, told him that it was a very serious case and that a cure would cost $10,000. Later he reduced the amount to $3,000. The doctor and appellant's wife talked over the telephone with appellant's brother. Some kind of an arrangement was made, and on March 22, 1933, appellant was taken to respondent's hospital. There is expert testimony from hospital physicians that at the time the small superficial cancer on appellant's lip had been cured by the treatment

which he had received at the other hospitals where he had been treated, and that he was only suffering from the after effect of the radium treatment which he had received. Appellant expected to be taken to Wyckoff Hospital, but while on the way in an automobile was told by Rigley that Dr. Hodkin had made arrangements at Park East Hospital. Rigley at the same time told him certain papers would have to be signed as a mere formality. Upon entering the hospital appellant found Dr. Hodkin there, who introduced Rigley to Sidney Goodwin, the superintendent and executive manager of the hospital, as " the man who has the cure." Appellant signed, without reading, certain papers which he was assured were mere formalities to relieve Rigley in case of any unusual accident and had nothing to do with the treatment. Appellant was placed in bed and Rigley, in the presence of Dr. Hodkin, proceeded to grind an arsenic compound and make a paste. He said, " The quicker I get that plaster on the better." Dr. Hodkin lined out on appellant's chin where the plaster should be placed and told Rigley, " This is where you want to put the stuff on." Rigley said, " No, I don't want it that way. I want it my way." The doctor said, " All right, go ahead," and left the room. He did not return for over two weeks.

After he left, Rigley scratched appellant's chin until the blood came and then applied the paste and fastened it on with a bandage. During the time the hospital nurse was in the room and Rigley told her he was not a doctor. Referring to the paste, Rigley told her that it contained white arsenic and herbs; that it was the most powerful poison in the world, but that his herbs controlled it. When Rigley left he gave the nurse his telephone number and told her to call him if it began to hurt. Rigley's name and telephone number were written on a hospital record. In two or three days appellant commenced to suffer pain and his face commenced to swell. Rigley put new skin on the lip where the abrasion was in an effort to stop the flow of saliva. He told the nurses

to administer aspirin and whisky in case of pain, and they did so. Rigley was present most of the time, " in and out all day long." He told the nurse how to put the bandage back on if it fell off. Every day Rigley brought as many as eight or ten people into the room, took off the bandage and demonstrated his treatment, gave a talk on his cure, exhibited pictures of Smith, and clippings from the papers in the presence of the nurse. After appellant had been in the hospital two or three weeks, Dr. Hodkin came into his room with Mr. Goodwin and a hospital doctor. He said, " I will show you this * * * and see how he is progressing." He took the outer bandage off and pulled down a part of the bandage with the paste on. He said, " I don't know a darn thing about this * * * this is all new to me." The hospital physician asked him, " Didn't you have that analyzed or looked into? " He replied, " No. It is his secret. The only one that knows anything about it is him [Rigley]." He said he could not have it analyzed because there are herbs in it and you could not find out what the herbs are. " The herbs nobody can find out. He is the only one that can get it." Mr. Goodwin, the superintendent, said: " We will have to play along with him [Rigley]. If everything comes out all right, we will be all taken care of." One night appellant suffered a hemorrhage and the nurse telephoned Rigley. On one occasion when appellant had a hemorrhage a house physician was called in to stop it. The paste was allowed on appellant's face for twenty-one days, although medical experts testified that it should never be allowed to remain on over eighteen hours. Appellant remained in the hospital fifty-nine days, at the end of which period his hospital bill was in arrears, and Goodwin, the superintendent, insisted upon his leaving. When appellant left the hospital the flesh had been eaten away from the lip and chin. There was no lip or chin left, and his teeth fell out. It is not necessary to give the horrible details

of his condition. Medical experts testified that the treatment administered by Rigley was a competent producing cause of his condition.

The foregoing is a statement of the facts which the jury might have found. There were issues of fact which were resolved by the jury in appellant's favor. As the reversal was upon the law we are bound by the facts which the jury might have found.

The evidence introduced by the appellant, if believed by the jury, as we must assume that it was, justified the jury in finding that the hospital admitted appellant knowing that the purpose of his being there was for an improper treatment by a layman, "the man who has the cure," as stated by Dr. Hodkin when he introduced Rigley to Mr. Goodwin, the superintendent; that the hospital records showed that Rigley actually personally treated appellant; that nurses, hospital physicians and the superintendent and executive manager knew, during the period that appellant was in the hospital, that appellant was being treated by Rigley, not under the supervision of a doctor; that the superintendent, Goodwin, knowing all about what was going on, stated, "We will have to play along with him. If everything comes out all right, we will be all taken care of." The superintendent knew that the paste being applied was a secret preparation, its contents known only to Rigley.

Goodwin, the superintendent, knew or should have known that Rigley was engaged in the commission of a crime and that the hospital, in affording its facilities for pay, was aiding and abetting him in the performance of such criminal act. (Education Law [Cons. Laws, ch. 16], § 1263.)

Private, non-charitable hospital corporations operated for profit are liable for the torts of their executive officers committed within the general scope of their authority.

Professor Harper, in his Law of Torts, referring to the liability of private corporations for tort, says: "Corpora-

tions commit torts by the same people who effect and consummate their legitimate activities. For the most part, a corporation is liable, as an individual, for tort committed by its servants or agents acting within the scope of their service or agency quite as it is liable on its contracts properly executed and entered into by its agents." (§ 293 and cases collated.)

A corporation is liable for a slander uttered by its superintendent while engaged in the corporation's business (*Tandy* v. *Prudential Ins. Co.*, 240 App. Div. 709; affd., 263 N. Y. 541); for assault (*Genga* v. *Director General of Railroads*, 243 Mass. 101); for false imprisonment (*Jacques* v. *Childs Dining Hall Co.*, 244 Mass. 438), and for various other torts.

The doctrine of *ultra vires* has no application. If it had, all corporations would be exempt from liability for torts as torts are not authorized by corporations' charters or by-laws. (*Hannon* v. *Siegel-Cooper Co.*, 167 N. Y. 244.)

The question always is whether the tort was committed by a representative of the corporation while engaged in the business in which he was employed by the corporation. The same principle applies to a private hospital corporation engaged in business for profit. It owes a duty to its patients.

" It is the duty of the owner of a sanitorium conducted for private gain to use reasonable care and diligence not only in treating but in safe-guarding a patient, measured by the capacity of the patient to provide for his own safety." (*Robertson* v. *Towns Hospital*, 178 App. Div. 285, 287. Cf. *Tulsa Hospital Association* v. *Juby*, 22 A. L. R. 333, and note, where many cases are collated.)

In the case at bar the basis of liability is not the negligence of the doctor or nurse in charge, but the wrongful conduct of the executive manager and superintendent acting within the scope of his authority in affording for pay the use of the hospital and its facilities for the purpose of the commission of acts which constitute a tort

and a crime in violation of a duty owed a patient. (Cf. *Schloendorff* v. *Society of New York Hospital*, 211 N. Y. 125, 132, 134.) The majority of the Appellate Division based its decision that a recovery could not be sustained upon the ground that the only fault was that of the doctor and nurse. In that we think that court erred. Rigley and Dr. Hodkin have not appealed. Rigley was arrested, plead guilty to a charge of unlawfully practicing medicine based on his conduct in this case, and was sentenced to one year in jail.

We have not overlooked various other questions urged by the respondent, but have reached the conclusion that none of them as a matter of law justify the reversal by the Appellate Division.

The judgment of the Appellate Division and that of the Trial Term should be reversed and a new trial granted, with costs to abide the event.

CRANE, Ch. J., O'BRIEN, LOUGHRAN and RIPPEY, JJ., concur; LEHMAN and FINCH, JJ., dissent.

Judgments reversed, etc.