EARL K. DAVIS, ADMINISTRATOR OF THE ESTATE OF EVA D. DAVIS, DECEASED
    v. THOMAS B. WILSON, M.D.; ALBERT L. CHASSON, M.D.; AND AR-
    THUR E. DAVIS, M.D.

(Filed 23 July 1965.)

**1. Physicians and Surgeons § 12—**

As a general rule, a physician who exercises due care is not liable for the negligence of nurses, attendants or internes who are not his employees.

**2. Master and Servant § 3—**

Ordinarily, a general manager, even though he aids in the selection of subordinate employees and has direction and control over such subordinates in the performance of their duties, is not an independent contractor and is not liable for the negligence of such subordinate employees when such subordinate employees are on the payroll of the principal employer and subject to his ultimate control, and perform their duties in the furtherance of the principal employer's business.

**3. Physicians and Surgeons § 12—    Evidence held to show that physicians in charge of hospital laboratory were employees and not independent contractors.**

The evidence tended to show that the physicians in charge of the laboratory department of a hospital were paid by the hospital, had supervisory responsibility for the conduct and work of the personnel of the department, but that their conduct and management in respect to the department was under the policy of the hospital, and that the technologists under their supervision were paid by the hospital. This action was brought against the physicians in charge of the laboratory department of the hospital for damages and wrongful death of a patient resulting from error of a medical technologist in the laboratory department in sending incompatible blood to the operating room for a transfusion for the patient. *Held:* Motions of the physicians for nonsuit were properly allowed, since under the evidence they were not independent contractors but fellow employees of the medical technologist, and are not liable for any negligence of their fellow employee.

APPEAL by plaintiff from *McKinnon, J.,* September 1964 Civil Session of WAKE.

Civil action to recover damages for pain and suffering prior to death of his intestate and for wrongful death of his intestate allegedly caused by a severe blood transfusion reaction of incompatible blood, two containers of which blood had been mistakenly and negligently labeled as compatible blood by Mrs. Frances W. Smith, a medical technologist at Rex Hospital who was an agent of the three defendant doctors, the relationship of which doctors with Rex Hospital was that of independent contractors.

Defendants in their joint answer deny that their relationship with Rex Hospital was that of independent contractors, and also deny any responsibility for Frances W. Smith's negligence on the ground she was not their agent.

From a judgment of compulsory nonsuit entered at the close of plaintiff's case, he appeals.

*Bailey and Ragsdale by George R. Ragsdale for plaintiff appellant.*
*Young, Moore & Henderson by J. C. Moore for defendant appellees.*

PARKER, J.   This is a summary of plaintiff's evidence:

Plaintiff's intestate, Eva D. Davis, who was his wife, was admitted in Rex Hospital, Raleigh, North Carolina, as a patient to have a surgical operation for removal of an ulcer. On 24 September 1963 in Rex Hospital, Dr. L. Gordon Sinclair, a surgeon, performed an operation on Mrs. Davis for a sub-total gastrectomy vagotomy for ulcer. The day before her operation a requisition to cross-match blood for Mrs. Davis

DAVIS *v.* WILSON.

was sent to Frances W. Smith in the laboratory of Rex Hospital where the hospital's blood bank was. Dr. John C. Doerr, a physician and a specialist in anesthesiology practicing in Rex Hospital, attended Mrs. Davis in the operating room, and transfused into her arteries and veins blood from donor 1738. There were no undue complications, and Mrs. Davis went through the surgery quite well, and went to the recovery room in excellent condition.

About 4:30 p.m. that afternoon, or some two or four hours after the operation, Dr. Sinclair went to the recovery room to see Mrs. Davis, and observed that urine coming through the catheter was thick and black, which indicated to him that she had experienced a severe blood transfusion reaction. The appearance of dark fluid coming through the catheter means the blood of the patient and the blood of the donor have been fighting, and that the blood cells are broken down and excreted by the kidneys. In an endeavor to stop the oozing of blood, about 6 p.m. he opened her abdomen again. Being unable to control the oozing of blood by any surgical maneuver, he packed the area hoping to control the bleeding. During the second operation she was given more blood and drugs, and her blood pressure came up to about normal. During the end of the second operation, Mrs. Davis had a cardiac arrest and her heart stopped. He started it again by external massage. Mrs. Davis was carried from the operating room again to the recovery room. At that time she looked fairly well. This lasted a short time. She grew worse, and died at 9:18 p.m.

Dr. Sinclair testified in effect that a blood transfusion reaction is caused when a patient receives blood incompatible with his own. That Mrs. Davis was given two pints of blood during the first operation, and that she had at least two or three additional pints of blood during the second operation. That the typing and cross-matching of blood is done in the blood bank at Rex Hospital. The blood is sent with a marked slip, and there is a corresponding slip on the patient's chart which may be compared with the slip on the container of blood to see if they are identical. That he relies on the slips that the blood had been typed in the pathology laboratory at Rex Hospital.

Dr. Sinclair also testified to the effect that, in his opinion, the three doctor defendants are well-qualified pathologists, and that as to the technical side of Frances W. Smith's work "he would be delighted for her to cross-match his blood."

Frances W. Smith works in the blood bank at Rex Hospital as a medical technologist. She has had special training in this field, and has worked in the laboratory at Rex Hospital for five years. Her duties are processing blood, cross-matching blood from donors, and making it available for patients. In September 1963 she typed blood for Mrs.

Eva Davis, determined what her blood type was, cross-matched some other person's blood with hers, and found that it was compatible with her blood. That the type blood was "O." She does not know whether she typed the blood in container number 1738, but she did place the name of Mrs. Eva Davis on that container. Frances W. Smith was asked on direct examination, "how it happened that she placed Mrs. Davis's name on that container?" She testified as follows:

> "When I received the request to cross-match blood for Mrs. Eva Davis, who was supposed to go to surgery the next day, the patient was sampled, that is blood was taken from the patient, and she was grouped, an Rh, and a cross-match was set up on her which was compatible. At that particular time we were quite busy, but the cross-match was gotten ready and was compatible. The whole blood bank was quite busy at that time, and since this was not something that was rushing I didn't think that I should rush to write up the requisition, that that should be something that I could do at a later time when we were not quite so busy, so the cross-match was made and put aside with the requisition and in transposing the numbers is where I made the mistake. I wrote the wrong group for the patient as well as the wrong pint of blood that was compatible for the patient. I wrote up a requisition and I wrote the patient's group as being an "A" positive whereas she was not, as she was an "O" positive. And also in the transposing of the number that was compatible with her. The cross-match that I had set up for the patient was "O" positive and the pint of blood was "O" positive which was cross-matched with the patient and was compatible, and it was in the transposing of the numbers that there was a mistake."

This is a summary of the testimony of Joseph E. Barnes, director of Rex Hospital:

Rex Hospital is a corporation, whose operations are controlled by a board of trustees. He is next in order of control as director of Rex Hospital. The hospital is divided into various departments, one of which is the laboratory department, which is generally in charge of the typing and cross-matching of blood. Dr. Thomas B. Wilson is chief of the laboratory department or chief pathologist. Dr. Wilson was employed by the board of trustees of Rex Hospital to provide adequate organization, both professional and nonprofessional, for the laboratory of the hospital. Defendant Doctors Albert L. Chasson and Arthur E. Davis are associated in the laboratory department with Dr. Wilson. Rex Hospital does not have a relationship with all three of these doc-

tors, but has a relationship only with Dr. Wilson. He and Dr. Wilson have a dual responsibility for the employment of personnel in the pathology department. He is not competent to pass upon the professional qualifications of applicants for work in the laboratory department. He and Dr. Wilson participate in the recruitment together, but the selection is made by Dr. Wilson. Dr. Wilson delegates the work and the details to the employees under him. Dr. Wilson receives by arrangement with Rex Hospital a percentage of the gross proceeds of the laboratory, which includes a percentage of the gross proceeds for the typing and cross-matching of blood. The charges for services rendered to patients in the pathology department are sent to the business office of Rex Hospital, where they are posted to the accounts of the patients. Based upon these records, Dr. Wilson's percentage is computed. Dr. Wilson divides this gross percentage among his associates.

This is a summary of the testimony of Dr. Wilson, who was called and testified as a witness for plaintiff, except when quoted: He is a physician and practices at Rex Hospital as a pathologist. He is at the top of the pathology department by reason of seniority. Next to him is Dr. Chasson, a pathologist in this department, who has specific responsibility over the blood bank in the department. This responsibility is also shared by himself and Dr. Davis, another pathologist in the department. He is "responsible for the over-all laboratory with the thorough understanding that those responsibilities must, however, be shared equally by the two other pathologists." As a member of the laboratory department, he has supervisory responsibility for the conduct and work of Frances W. Smith. He has liberty to conduct his practice. "As far as the relationship of the laboratory is concerned, which is a part of the hospital of course, my conducting, my management within that sphere must come under the policies of the hospital which are indicated through the director of the hospital and the board of trustees." An agreed percentage of the gross proceeds from the laboratory department available to the pathologists is divided by mutual agreement between Doctors Chasson, Davis, and himself, and Rex Hospital sends each one of them separate cheques in payment. Rex Hospital has an agreement with Doctors Chasson and Davis through him as senior pathologist. He has supervisory administrative responsibility for the conduct of the personnel of the pathology department. The pathology department is composed of several sub-departments. In each of these sub-departments there is a technologist who has had from five to ten years of experience in technology. There are a senior technologist and three pathologists.

All technologists and clerical personnel connected with the laboratory are interviewed by the laboratory personnel to determine their

qualifications, and if their qualifications are satisfactory, they are sent down to the personnel office of Rex Hospital for the completion of their employment. "He passes on the medical or technical qualifications of personnel in the laboratory, but that the final approval as to the need or the opening or the salary is Mr. Barnes'; that if he felt that if the department needed a technician tomorrow he could recommend that a technician be added, but that the ultimate approval would be Mr. Barnes'." Frances W. Smith and the other technicians in the pathology department were paid for their services by Rex Hospital. He never paid Frances W. Smith anything.

He recalls interviewing Frances W. Smith when she applied to Rex Hospital for a job. She had been interviewed before he saw her by Dorothy McGhee, chief medical technologist in the pathology department of Rex Hospital, who went over Frances W. Smith's credentials, her background and her training, and then referred her to him for an additional interview. He testified: "I interviewed Mrs. Smith then and I recommended that she be employed, and she was sent then to the employment office for the completion of her records * * *." The pathology department at Rex Hospital does between eight and ten thousand cross-matchings of blood per year, and Frances W. Smith does about half of these. He had no connection with Mrs. Davis while she was in the hospital.

After Mrs. Davis's death Dorothy McGhee, chief medical technologist in the pathology department of Rex Hospital, and Dr. Chasson made an investigation as to Mrs. Davis's death. Their investigation disclosed that Mrs. Davis's blood group was group "O", Rh positive, and the donor's blood group was group "A", Rh positive, and that the cross-match of blood was incompatible. The blood containers sent to the operating room for Mrs. Davis were numbered 1738 and 1742. The container numbered 1738 was labeled "O", Rh positive, and that after Mrs. Davis's death she checked this container and found out it contained "A", Rh positive blood, and Mrs. Davis's name was on it.

Frances W. Smith was supervised in doing her work in typing and cross-matching blood by Dorothy McGhee. She usually goes to Dr. Wilson with her problems. Rex Hospital pays her by cheque every two weeks for her work in the pathology department, and makes deductions for social security, taxes, etc. At the end of each year, Rex Hospital gives her a W-2 form indicating the amount it has paid her during the year for her services, and the amount of tax it has withheld. Dorothy McGhee set the vacation schedule for people who worked in the pathology department of Rex Hospital.

The decision in *National Homeopathic Hospital v. Phillips*, 181 F. 2d 293, which is a case with a factual situation quite similar to the fac-

tual situation in the instant case, is most helpful, and is in point. In that case the decision of a unanimous Court written by Circuit Judge Proctor is as follows:

"This appeal is from a judgment against appellant hospital for the death by negligence of a patient resulting from a transfusion of incompatible blood erroneously tested and reported as compatible by a technician in the hospital laboratory.

"The main question is whether such a relationship prevailed between the hospital and technician as to render the hospital liable upon the principle of *respondeat superior.* The trial court held a master and servant relationship did exist, and submitted the question of negligence to the jury, which returned a verdict for the plaintiff.

"We think the court was right. The undisputed evidence showed that the laboratory was an established part of the hospital. By arrangement with an outside physician it was operated under his overall direction. The technician was hired and paid by the hospital. In the instant case the hospital, in usual course, ordered a laboratory test. The technician, without the presence or supervision of the physician, made the test and submitted her report directly to the hospital. Relying thereon the hospital made the transfusion. In our opinion the facts clearly established the responsibility of the hospital for the acts of its technician. That responsibility is unaffected even though, agreeably to the requirements of 2 D. C. Code (1940) §§ 101, 102, and 134(b), the technical work in the laboratory was put under the 'direction' of a physician."

Where it appeared that the plaintiff, a patient at the defendant hospital, was given a serological test to determine her Rh blood factor, which test was given by a laboratory technician employed by the defendant hospital, and that the technician concededly made an error in designating the plaintiff's blood type, with the result that she was infused with blood of the wrong type and suffered serious injuries for which she brought suit, the court in *Berg v. New York Soc. for Relief of the Ruptured & Crippled* (1956), 1 N.Y. 2d 499, 154 N.Y.S. 2d 455, 136 N.E. 2d 523, in reversing the judgment of the Appellate Division, 286 App. Div. 783, 146 N.Y.S. 2d 548, which held in favor of the defendant hospital on the ground that the negligence of the technician was a medical rather than administrative act because it was integrally related to medical care, reinstated the judgment of the trial court which directed a verdict for the plaintiff, 136 N.Y.S. 2d 528, and held that although it was a medical act in the sense that it was preparatory to a transfusion, the test was performed, not by a physician or nurse, but

by a technician who was employed and paid by the hospital and was so far short of professional status or attainments that only 4 to 6 weeks training was necessary for her job, so that she could not be classed as an independent contractor, but rather as a salaried employee of the hospital, for whose negligence the hospital was liable. In its opinion the Court said:

> "Modern hospitals hire on salary not only clerical, administrative and housekeeping employees but also physicians, nurses and laboratory technicians of many kinds. Not only do they furnish room and board to patients but they sell them services which are 'medical' in nature and, though furnished on physician's orders, are performed wholly by and under the control of the hospitals' salaried staffs."

See Annot. 59 A.L.R. 2d 768, entitled "Liability of injury or death from blood transfusion."

As a general rule, a physician who exercises due care is not liable for the negligence of nurses, attendants or internes who are not his employees. *Covington v. Wyatt,* 196 N.C. 367, 145 S.E. 673; 70 C.J.S., Physicians and Surgeons, § 54(f), p. 979.

*Jackson v. Joyner,* 236 N.C. 259, 72 S.E. 2d 589, relied on by plaintiff is factually distinguishable from the instant case. In this case the evidence tended to show that the surgeon performing the operation selected and arranged for the help of an anaesthetist employed by the hospital and had full power and control over him in the performance of his duties in administering the anaesthetic during the operation. The Court held the anaesthetist was, during the period of the operation, the agent of the surgeon, and the surgeon is liable for the negligence of the anaesthetist in the administration of the anaesthetic.

In 1 Labatt's Master and Servant (2d Ed.), § 32, it is stated:

> "It is well settled that, where an employee, acting under the express or implied authority of his principal, engages servants to perform work for the benefit of his employer, the principal, and not the employee, is in law the master of the servants so engaged. This doctrine is an obvious and necessary consequence of the fact that, in the case supposed, the power of controlling the servants, even though it may normally be exercised by the agent after they are hired, really resides in the principal, and may at any time be called into active exercise."

In 2 Restatement of the Law of Agency 2d, § 358, p. 132, it is said:

"Comment on Subsection (1):

"a. The doctrine of *respondeat superior* does not apply to create liability against an agent for the conduct of servants and other agents of the principal appointed by him, even though other agents are subject to his orders in the execution of the principal's affairs. He is, however, subject to liability under the rules stated in Sections 344, 351, 356, if he directs or permits tortious conduct by them or fails properly to exercise control over them.

"Illustration:

"1. A is employed by P as general manager. B, a servant under the immediate direction of A, is negligent in the management of a machine, thereby injuring T, a business visitor. A is not liable to T."

To the same effect, see Story on Agency, 9th Ed., § 313, p. 385; 57 C.J.S., Master and Servant, § 564; 35 Am. Jur., Master and Servant, § 540.

All the evidence clearly shows the following: The board of trustees of Rex Hospital employed Dr. Thomas B. Wilson, a physician specializing in pathology, as chief of the laboratory department of the hospital or chief pathologist to provide adequate organization, both professional and nonprofessional, for the laboratory department. Doctors Chasson and Davis, both pathologists, are associated in the laboratory department with him, and are all paid by cheque by Rex Hospital for such services as regular employees of Rex Hospital. Dr. Wilson and the two other defendant doctors associated with him have supervisory responsibility for the conduct and work of the personnel of the laboratory department, including the conduct and work of Frances W. Smith in typing and cross-matching blood in the laboratory, but his and their conduct and management in respect to the laboratory department of Rex Hospital "must come under the policies of the hospital which are indicated through the director of the hospital and the board of trustees" of Rex Hospital. Frances W. Smith was paid for her services in the laboratory department of Rex Hospital every two weeks by cheque by Rex Hospital. A laboratory of a modern hospital is essential to its operation. There is nothing in the record to show that the three defendant doctors supplied to the employees in the laboratory department of Rex Hospital any supplies or equipment to do this work. It is a fair inference that all this was furnished by Rex Hospital. Generally, physicians engaged in the practice of their profession are regarded as independent contractors. 27 Am. Jur., Independent Contractors, § 17. However, it is manifest from all the evidence in this case that the work and management in respect to the laboratory department of Rex Hospital

by the three defendant doctors, regularly employed and salaried members of the staff of Rex Hospital, and their supervisory control of the personnel and work of this department, was under the control of the director of Rex Hospital and its board of trustees, and consequently the three defendant doctors in respect to their work and duties in the laboratory department of Rex Hospital were employees and servants of Rex Hospital and not independent contractors. *Pressley v. Turner,* 249 N.C. 102, 105 S.E. 2d 289; *Hayes v. Elon College,* 224 N.C. 11, 29 S.E. 2d 137; 27 Am. Jur., Independent Contractors, §§ 5 and 6; 56 C.J.S., Master and Servant, § 3; Annot. 20 A.L.R. 684.

All the evidence in this case clearly and plainly shows that Frances W. Smith at all times relevant in the instant case was an employee of Rex Hospital, regularly employed and paid by it as an employer, and that she was not an agent or employee or servant of the three defendant doctors, or any one of them. There is nothing in the record before us to show that the three defendants, or any one of them, knew that Mrs. Davis was in Rex Hospital for surgery or that blood for transfusion had been requested for her and furnished by the laboratory department of the hospital. There is no evidence in the record before us, considering it in the light most favorable to plaintiff, that would permit a jury to find that Frances W. Smith was an agent or employee or servant of the three defendant doctors, or any one of them, so as to hold them, or any one of them, responsible for the tragic negligence of Frances W. Smith, which she admits, on the principle of *respondeat superior.*

The judgment of compulsory nonsuit is
Affirmed.