**Vincent A. ALDEN, Appellant,**

v.

**PROVIDENCE HOSPITAL, George W. Ware, and Habeeb Bacchus, Appellees.**

**No. 20011.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 20, 1966.

Decided July 7, 1967.

Petition for Rehearing En Banc Denied Sept. 15, 1967.

---

Mr. Robert E. Miller, Washington, D. C., for appellant.

Mr. J. Harry Welch, Washington, D. C., for appellee Ware.

Mr. Jeremiah C. Collins, Washington, D. C., for appellees Providence Hospital and Habeeb Bacchus.

Before BURGER, WRIGHT and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

The appeal in this malpractice case presents only one question: Did the trial court err in directing the verdict of the jury for the defendants at the close of the plaintiff's case? We conclude that it did as to the hospital and its chief medical resident, Dr. Bacchus. We therefore reverse for a new trial as to them. We affirm as to Dr. Ware.

Appellant was admitted to Providence Hospital in August 1956 with a condition diagnosed as bulbar poliomyelitis. On March 17, 1957, he was transferred from Providence Hospital to the Polio Rehabilitation Hospital at Warm Springs, Georgia, for further care and treatment. Medical examinations, including x-ray studies, at the Warm Springs Hospital on March 18, 1957, and at the Emory University Hospital, to which appellant was transferred from Warm Springs, on March 19, 1957, disclosed that, in addi-

tion to his polio problems, he had been suffering from chronic empyema for several months and that the empyema had resulted in a collapse of the right lung. No diagnosis of empyema had been made prior to his arrival at Warm Springs, and as a result of the empyema appellant's fifth and sixth ribs on the right side had to be removed by surgery. The basis of appellant's claim is that the appellees were negligent in failing to discover, diagnose and treat the chronic empyema while he was a patient at Providence Hospital, and that his transfer from that hospital while suffering from this disease exacerbated his condition.

■ The test to be applied in ruling on a motion for a directed verdict made at the close of the plaintiff's case is clear and uncontested in this litigation. Unless the evidence, along with all inferences reasonably to be drawn therefrom, when viewed in the light most favorable to the plaintiff is such that reasonable jurors in fair and impartial exercise of their judgment could not reasonably disagree in finding for the defendant, the motion must be denied.[1] With this test in mind, we first briefly review the evidence.

Empyema is an infection of the pleura, the membrane covering the lung, characterized by pus in the pleural cavity often leading to collapse of the lung. The Providence Hospital record in evidence here shows that for months prior to appellant's transfer from that hospital on March 17, 1957, the pleural fluid in his right lung was presenting a problem. Indeed the x-rays showed continued "opacity of the right lung field which could be due to excess pleural fluid and pleural thickening." On one occasion a thoracentesis was performed in which 600 cc's of cloudy yellow fluid was drawn from appellant's lung. The hospital record shows that time and again there were "no breath sounds and dullness to percussion over the right lung lobe," indicating pleural fluid and pleural thickening around the lung.

These symptoms, in addition to continuous coughing and temperature, were present throughout appellant's stay at Providence Hospital, according to its own records. Yet the hospital transfer form outlining his physical condition on transfer, signed by Dr. Bacchus as chief medical resident for the hospital, showed "chest, heart and lungs negative." The hospital record also showed, and indeed appellant testified, that Dr. Bacchus had on numerous occasions examined, treated and otherwise acted as a physician with reference to appellant during his stay at Providence Hospital. Appellant also testified that Dr. Bacchus advised him to transfer to Warm Springs. The record in this case also contains evidence from a practicing physician in the District of Columbia that on March 17, 1957, appellant had chronic empyema, and that it was not in accordance with good medical practice for a hospital or a doctor in the District of Columbia to transfer a patient in this condition.

The inferences reasonably to be drawn from this evidence are, of course, that the appellant did indeed have chronic empyema during the months he was at Providence Hospital, that the hospital's chief medical resident had failed to use the same degree of care which a physician practicing in the District of Columbia would normally be expected to use in diagnosing and treating that condition, and that the hospital through its employees, including Dr. Bacchus, had not exhibited that degree of care in diagnosing and treating appellant's empyema that would reasonably be expected of a hospital in the District of Columbia. Consequently, the case was one for the jury as to Dr. Bacchus and the hospital.[2]

1. Continental Ore. Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); 5 J. MOORE, FEDERAL PRACTICE ¶ 50.02 [1], at 2326–2329 (2d ed. 1966); 2B W. BARRON & A. HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 1075 (Wright ed. 1961).

2. Garfield Memorial Hospital v. Marshall, 92 U.S.App.D.C. 234, 204 F.2d 721, 37 A.L.R.2d 1270 (1953); Price v. Neyland, 115 U.S.App.D.C. 355, 320 F.2d 674, 99

■ Unlike other jurisdictions which have been plagued by confusion in their malpractice jurisprudence, particularly as to hospitals, the law in the District of Columbia in this area has been clear for some years. In general it is the duty of a hospital here to give the patient such reasonable care and attention as his condition requires. "This duty is measured by the degree of care, skill and diligence customarily exercised by hospitals generally in the community, and by the express or implied contract with the patient." Garfield Memorial Hospital v. Marshall, 92 U.S.App.D.C. 234, 239, 204 F.2d 721, 725, 37 A.L.R.2d 1270 (1953). Moreover, "[i]f a hospital undertakes to render services customarily performed by physicians, it must perform such services with the same degree of care to which a private physician is held * * *." *Ibid.*

■■ Actually, even though a patient has an attending physician selected by him, when that patient goes to a hospital, the service rendered by the hospital ordinarily includes medical care from the doctors and nurses employed by the hospital as well as access to any laboratory facilities maintained by the hospital. While it may be that an attending physician remains in charge of the case, the hospital and its agents remain responsible for those services it performs, or should perform, under the circumstances of the case and according to good medical practice.[3]

■ We affirm as to Dr. Ware because his contact with appellant's case ended on November 10, 1956, four months before the transfer to Warm Springs. No expert evidence was produced to show that during the time Dr. Ware was associated with appellant's case the empyema should have been diagnosed and treated, if indeed it then existed.

Reversed as to Providence Hospital and Dr. Bacchus; affirmed as to Dr. Ware.

BURGER, Circuit Judge (concurring in part and dissenting in part):

I concur in the action of the Court as it relates to Dr. Ware and I dissent from the grant of a new trial as to the hospital and its resident physician. In my view the majority misreads the record and misconceives the respective roles of physicians and hospitals in their relationships with patients. I agree with the statements of law recited by the majority as they are plainly applicable to attending physicians, but I do not believe that any of them have relevance on this record as to the hospital and its employees. The majority opinion confuses the duty of the hospital and private attending physicians by equating them. Nothing could be further from the true situation where these functions are properly understood.

A hospital, as its name implies, is a hostel with special services, but it is nonetheless essentially a custodial institution, albeit a very high form of custody. Obviously this does not mean that it is sufficient for a hospital to admit a patient to its premises and then close its eyes to whatever befalls him. "It may be liable, in the first instance, if it has failed adequately to screen the members

A.L.R.2d 1391 (1963); Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 57 A.L.R.2d 364 (1952). *Compare* Stivers v. George Washington University, 116 U. S.App.D.C. 29, 320 F.2d 751 (1963).

3. United States v. Brown, 348 U.S. 110, 113, 75 S.Ct. 141, 99 L.Ed. 139 (1954); Sheehan v. North Country Community Hospital, 273 N.Y. 163, 7 N.E.2d 28, 109 A.L.R. 1197 (1937). *See also* cases collected in Annot., 25 A.L.R.2d 29 (1952). *Compare* Hohenthal v. Smith, 72 App. D.C. 343, 114 F.2d 494 (1940). In *Hoh-*

*enthal,* Judge Rutledge, later Mr. Justice Rutledge, wrote for the court, 72 App.D. C. at 345, 114 F.2d at 496:

"* * * Part of the service furnished to the patient and charged for by the hospital is the assistance of nurses, interns and attendants in caring for the patient after the operation pursuant to instructions given by the operating surgeon. They perform the duty of their employer (the hospital) to the patient when they carry out the instructions of the doctor. * * *"

of its medical staff [nurses, attendants and physicians] or if it has permitted them to act beyond the scope of their competence." [1] Similarily, under the doctrine of *respondeat superior,* a hospital may be liable for its agent's negligence in the performance of specialized services customarily rendered by a hospital,[2] the failure of its agents to carry out the instructions of, or the agent's negligence in assistance to, the patient's private physician,[3] or in its agent's failure to attend to the safety of the patient as his condition requires.[4] And, of course, the hospital is liable for failure to maintain its premises or equipment in proper condition to insure safety as judged by prevailing local standards.[5]

Hospital liability predicated on *respondeat superior* is a relatively new concept. *See* Bing v. Thunig, 2 N.Y.2d 656, 163 N.Y.S.2d 3 (1957).[6] This change in the law is a reflection of the fact that the hospital of today "conducts a highly integrated system of activities," Ybarra v. Spangard, 25 Cal.2d 486, 493, 154 P.2d 687, 691 (1944). I agree with the majority that

> [P]art of the service furnished to the patient and charged for by the hospital is the assistance of nurses, interns and attendants in caring for the patient after the operation pursuant to

instructions given by the operating surgeon.

Hohenthal v. Smith, *supra* note 3, 72 App.D.C. at 345, 114 F.2d at 496. The hospital assumes the duty to carry out the instructions of the doctor; but a hospital does not render *treatment* except pursuant to a doctor's order.

I suggest that Judge Wright's opinion falls into the same error as that of Appellant who failed to understand the difference between the role of the physician and that of the hospital. It is not the function of a private hospital to diagnose or treat patients except as the agent of the patient's private physician and under his explicit order. This is because it is the physician, not the hospital, who is the healer. Diagnosis and treatment are the functions of the physicians, not the private proprietary hospital. It "serves the function only of a specialized facility, not a direct service healing institution," Fiorentino v. Wenger, 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296, 299 (1967). Of course there can be exceptions to this rule; for example, a private hospital might be liable for an act of malpractice even if performed by the patient's private physician if the hospital had reason to know that such act of malpractice would occur, and failed to challenge the physician and communicate

1. Appelman & Appelman, *Hospital Liability for Acts of Nonsalaried Staff Physicians,* 1964 Pers.Inj.Comm. 161; *e. g.,* Smith v. Duke University, 219 N.C. 628, 14 S.E.2d 643 (1941).

2. *E. g.,* National Homeopathic Hospital v. Phillips, 86 U.S.App.D.C. 295, 181 F.2d 293 (1950) (incompatible blood erroneously tested by lab technician); Davis v. Wilson, 265 N.C. 139, 144, 143 S.E.2d 107, 111 (1965) (same); Mull v. Emory University, Inc., 114 Ga.App. 63, 150 S. E.2d 276 (1966) (erroneous laboratory diagnostic tests); Jenkins v. Charleston General Hospital & Training School, 90 W.Va. 230, 110 S.E. 560, 22 A.L.R. 323 (1922) (improper x-rays taken by hospital radiologist).

3. *E. g.,* Hohenthal v. Smith, 72 App.D.C. 343, 114 F.2d 494 (1940) (intern's negligence in administering post-operative solution at direction of private surgeon);

Valetin v. LaSociete Francais De Befaisance Mutuelle, 76 Cal.App.2d 1, 172 P. 2d 359 (D.Ct.App.1946); Baker v. United States, 226 F.Supp. 129, 131 (S.D. Iowa 1964) (dictum), aff'd, 343 F.2d 222 (8th Cir. 1965).

4. *E. g.,* Wetzel v. Omaha Maternity and General Hospital Ass'n, 96 Neb. 636, 148 N.W. 582 (1914) (failure to properly observe a known mental patient).

5. *E. g.,* Hord v. National Homeopathic Hospital, 92 U.S.App.D.C. 204, 204 F.2d 397 (1953) (defective maternity room equipment); South Highlands Infirmary v. Camp, 279 Ala. 5, 180 So.2d 907 (1965); Valetin v. LaSociete Francais De. Befaisance Mutuelle, *supra* note 3.

6. *See generally* D. W. Louisdell & H. Williams, Trial of Medical Malpractice Cases 485–510; U.Pitt. Health Center, Hospital Law Manual, "Negligence" (2 Vols. 1959); Annot., 69 A.L.R.2d 305 (1960).

this knowledge to patient. Hendrickson v. Hodkin, 276 N.Y. 252, 11 N.E.2d 899 (1937). Thus, it "owes to every patient whom it admits the duty of saving him from an illegal operation or false, fraudulent or fictitious medical treatment," Hendrickson v. Hodkin, 250 App.Div. 619, 621, 294 N.Y.S. 982, 984–985 (dissenting opinion), rev'd, 276 N.Y. 252, 11 N.E.2d 899 (1937). See also HAYT, HAYT & GROESCHEL, LAW OF HOSPITAL, PHYSICIAN & PATIENT (2d ed. 1950).

Another exception arises out of the so-called "emergency doctrine," whereby the hospital undertakes in an emergency to accept and treat patients, where such patients at the time of the emergency have no private attending physician or such physician is unavailable. Garfield Memorial Hospital v. Marshall, 92 U.S. App.D.C. 234, 204 F.2d 721 (1953); Byron v. Eastern Dispensary & Casualty Hospital, 78 U.S.App.D.C. 42, 136 F.2d 278 (1943). A common illustration arises out of accident cases brought directly to the hospital without an attending physician. A third category, which is an exception in form only, arises where a private or charitable hospital may be liable for negligence in the diagnosis and treatment of "public patients," which the hospital accepts for diagnosis and treatment as charitable cases, or where it is required by law, contract or otherwise to provide treatment for certain classes of patients. Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 57 A.L.R. 2d 364 (1952) (dictum). See also Appelman & Appelman, supra note 1 at 181–83. This third category is not really an exception but a wholly different situation for there the hospital affirmatively undertakes to give both medical treatment and hospital care.

My disagreement with the majority stems from the fact that, in effect, the majority confuses the rule governing these exceptions with the general rule. This is a grave misconception of the respective roles of the private physician and private hospital toward the patient. It is egregious error to take the language—out of its context—from Gar-

field Memorial Hospital v. Marshall, supra, as authority for the proposition that "[i]t is the duty of the hospital here [in Washington, D. C.] to diagnose a patient's condition and give him such reasonable care and attention as the condition requires." Garfield involved in part the affirmative failure of the hospital to call the attending obstetrician at the time of an emergency premature birth and the holding is narrowly confined. This court predicated liability on the failure of the hospital resident in obstetrics to recognize labor symptoms which created an emergency, the failure of the nurse to call the resident physician when she was unable to get the maternity patient's private physician, and the failure of the delivery room nurses to assist the patient during delivery, supra at 240, 204 F.2d at 726. And the court made it abundantly clear that the hospital undertook to render services to the maternity patient in the absence of her physician and "until he can respond to the hospital's summons," id. at 238–39, 204 F.2d at 725–726 (emphasis added). This, I submit, is a case involving the emergency doctrine and nothing else; it is a totally different situation from the instant case, where no emergency existed and the patient was constantly attended for six months not by one, but by a host of doctors and specialists who were his agents, not those of the hospital.

For my part, this case turns on whether evidence in the record, viewed in the light most favorable to the Appellant, shows (1) a duty on the part of the hospital toward Appellant with respect to making a diagnosis of his ailment and making the decision to transfer him to Georgia; and (2) violation of that duty either by affirmative acts or omission on the part of the hospital and its agents. There is no such evidence and I challenge the majority to point to it if I am in error.

The record does not disclose that the hospital assumed any responsibility for diagnosis and treatment of Appellant. He was referred to the hospital by a physician not employed by the hospital

with a condition diagnosed by the physician as bulbar poliomyelitis. Appellant himself testified that he was later assigned a Dr. Bushnell Smith by the National Foundation for Infantile Paralysis. It is common knowledge that this Foundation exists to supply specialized medical aid in polio cases. Other testimony reveals Appellant's awareness of the fact that the Foundation made all the financial arrangements, and continued to do so at the time of trial. Furthermore, Appellant's expert witness testified as follows:

> He [Appellant] told me on 29 September 1965, that he, [sic] originally had been under the care of a Dr. Bushnell Smith, to whom he was assigned by some polio foundation, and he was put in Providence Hospital and Dr. Bushnell Smith was his doctor. * * *

> He told me that Dr. Smith was one of three doctors assigned by this foundation. He said he was very ill. Sometime during this assignment, he said Dr. Smith's term expired and some other doctor took over.

Correlation of the hospital records with this testimony shows that of the more than twenty doctors who saw Appellant, four names stand out; Dr. Bushnell Smith was the first of those supplied by the Polio Foundation. The records reveal his assignment ended about January, 1957, as did that of a Dr. Brown. Appellee Dr. Ware, as the majority notes, was out of Appellant's case well in advance of Appellant's discharge from the hospital. The fourth, Dr. Cobey, an official of the National Foundation for Infantile Paralysis, enters the record at the time Dr. Smith's term ended. It was Dr. Cobey, the records reveal, who made the decision and the arrangements for the transfer of Appellant to Warm Springs, Georgia, signing as "attending physician" the letter requesting Warm Springs to accept Appellant. The daily log also reveals that Dr. Cobey, not Dr. Bacchus, *authorized* the transfer.

Dr. Bacchus, as an agent of the hospital, did not authorize release but merely recorded on a form the reasons and the fact of release *authorized* by Dr. Cobey. Neither Dr. Bacchus nor the hospital had any authority to release Appellant or transfer him *except on the authority of the attending physician.*

The evidence on the factors necessary to pinpoint the responsibility for discharging Appellant is somewhat cloudy, but that, of course, is Appellant's burden of proof. The evidence suggests that the Foundation was controlling Appellant's hospitalization and assigning him doctors. The record is completely devoid of any other such information as to the numerous other doctors. If the hospital did indeed undertake some responsibility as to diagnosis and treatment which this record does not show, the contract between the hospital and the Foundation might have shed some light on this point; yet the contract was not introduced into evidence and, strange as it may seem, was never alluded to once by Appellant's counsel.[7] At this stage we must assume Appellant would have introduced it if he thought it was favorable to his case. This is Appellant's first failure of proof.

The second fatal failure of proof concerns evidence of alleged negligence against Appellee Bacchus. The majority characterization of Dr. Bacchus' activity (on page 3 of the slip opinion) is not supported by the record either as a whole or as to any specific part: I submit that the Court has an obligation to say what evidence it relies on rather than deal in vague generalities; in addition, the majority must point to the evidence on which it relies to show that the scope of Dr. Bacchus' duties as a Resident Physician embraced diagnostic duties and responsibilities. When Appellant called Dr. Bacchus to testify, he ascertained only that Dr. Bacchus was Chief Resident in Internal Medicine at the hospital while Appellant was a patient there.

7. The only knowledge of this contract comes from a series of letters exchanged between the Foundation and the hospital with reference to Appellant's readmission to the hospital upon his return to the District of Columbia.

But no testimony whatever was sought concerning his duties and responsibilities. Testimony merely hinting at a possible agency relationship is inadequate to establish that Dr. Bacchus, as agent of the hospital, owed a duty of diagnosis to Appellant which was breached. The evidence most favorable to Appellant shows that Dr. Bacchus saw Appellant from time to time, as is customary of hospital resident physicians and interns, and made notations on the charts during the last two months of Appellant's hospitalization. That Appellant "thought" Dr. Bacchus was one of his physicians does not make it so. The majority also notes Dr. Bacchus' name on the "hospital transfer form," which purports to show Appellant free from any illness. But hospital forms such as this are not diagnostic forms; they are simply a recording of what Appellant's doctors found. In short, that notation is nothing more than a reflection or digest of the patient's medical history derived in the ordinary course from the patient's charts; those charts reveal that the lungs and chest were clear at various times during the last month. I have already alluded to the fact that Dr. Cobey of the Polio Foundation made all arrangements for Appellant's transfer to Georgia, designating himself as "attending physician." By Appellant's own testimony, the Foundation presented the discharge forms to the hospital to facilitate his release and transfer. Finally, I need not point out that it is routine hospital practice for a patient's discharge to be authorized by the attending physician, not the hospital medical staff. The hospital staff has no such authority and Appellant failed to show any such power here. See HAYT, HAYT & GROESCHEL, *supra* at 411. This is also the practice of the Appellee hospital as shown by its constitution and by-laws which are part of the record. These critical facts are beyond dispute but the majority fails to deal with them.

The third failure in proof is developed from the testimony of Appellant's own expert medical witness. The witness testified that in his opinion Appellant had empyema on March 17, 1957, the date of transfer. But there is no testimony whatsoever that empyema could or should have been diagnosed by those in charge of his care, *i e.*, Dr. Cobey and the Polio Foundation. Thus Appellant's theory of improper diagnosis—even as against Dr. Cobey who was not sued—must fail because there is no testimony concerning the recognized medical standard for diagnosis of empyema.[8] *Cf.* Price v. Neyland, 115 U.S.App.D.C. 355, 320 F.2d 674, 99 A.L.R.2d 391 (1963). Furthermore, while testifying that transfer of a patient with empyema was not good medical practice, Appellant's expert testified unequivocally that the hospital and Dr. Bacchus were not responsible for the allegedly negligent transfer. He finally testified that responsibility for the improper transfer rested upon the *attending physician* since it was he who was responsible for the care and treatment of Appellant and it was he to whom the hospital, nurses, interns, and residents looked for directions and orders.

At the close of the case the evidence had produced a blurred and confused picture of the tragic illness. But a history which stirs our emotions and arouses sympathy is not sufficient to present a jury question on the issue of negligence. To summarize, Appellant's expert witness offered no standard of care with respect to the diagnosis of empyema, *see* Quick v. Thurston, 110 U.S.App.D.C. 169, 290 F.2d 360, 88 A.L.R.2d 299 (1961) (en banc), and established no duty on the part of the hospital and its agents to assume responsibility in this area. Indeed

---

8. Both at Providence and in Georgia, Appellant was diagnosed as having a condition known as atelectasis. Appellee Ware testified that atelectasis produces physical findings indistinguishable from those of empyema and also produces the uniform area of opacity in x-rays described by the majority. Adequate preparation of Appellant's case would certainly have facilitated carrying the burden of making out the case which the majority now tries to make for him.

Appellant's medical expert categorically negated such a duty, and showed beyond dispute that all responsibility for the improper transfer was on the attending physician,[9] not the hospital or Dr. Bacchus. Finally, if in fact the hospital assumed some diagnostic responsibility or undertook to treat Appellant, the record is totally devoid of any such evidence.

It is to be regretted that the "hard case" of one unfortunate person should evoke a holding which ignores the realities of hospital operations and the clear distinctions between hospital and physician functions. A public organization which performs such an important public service deserves better treatment than to be held responsible for acts and omissions which, whether negligent or otherwise, were the clear responsibility of the attending physicians, not the hospital.

---

9. At oral argument Appellant's counsel was questioned as to why Dr. Cobey and other attending physicians were not joined as defendants; he gave no responsive answer.