[This opinion has been published in *Ohio Official Reports* at 66 Ohio St.3d 544.]

BROWNING ET AL., APPELLEES, *v*. BURT; BLUE ET AL., APPELLANTS.

MITCHELL, APPELLEE, *v*. BURT; ST. ELIZABETH MEDICAL CENTER,

APPELLANT.

**[Cite as Browning v. Burt, 1993-Ohio-178.]**

*Courts—Limitation of actions—Hospital negligence arising out of "care" of a patient is a "medical claim" within meaning of R.C. 2305.11(D)(3) and subject to period of limitations set forth in R.C. 2305.11(B)(1)—Negligent credentialing of a physician by hospital is not "medical diagnosis, care or treatment" within meaning of R.C. 2305.11—Action against hospital for bodily injury arising from negligent credentialing of physician subject to two-year limitations period in R.C. 2305.10—Limitations period in R.C. 2305.10 commences to run, when—R.C. 2305.25 does not provide hospital with immunity for negligence in granting or continuing staff privileges of an incompetent physician.*

1.   Hospital negligence arising out of the "care" of a patient is a "medical claim" within the meaning of R.C. 2305.11(D)(3) and is subject to the period of limitations set forth in R.C. 2305.11(B)(1). "Care" as used in R.C. 2305.11(D)(3) is the prevention or alleviation of a physical or mental defect or illness.

2.   Negligent credentialing of a physician by a hospital is not "medical diagnosis, care, or treatment" within  the meaning of R.C. 2305.11.

3.   An action against a hospital for bodily injury arising out of the negligent credentialing of a physician is subject to the two-year limitations period set forth in R.C. 2305.10.

4. The period of limitations set forth in R.C. 2305.10 commences to run when the victim knows or should have discovered that he or she was injured as a result of the hospital's negligent credentialing procedures or practices.

5. R.C. 2305.25 does not provide a hospital with immunity from liability for the hospital's negligence in granting and/or continuing the staff privileges of an incompetent physician.

(Nos. 91-2079 and 91-2121—Submitted January 20, 1993—Decided June 30, 1993.)

Appeals from the Court of Appeals for Montgomery County, Nos. 12176 and 12244.

_____

{¶ 1} The two cases before us today are representative of many actions filed in Montgomery County relating to the drastically unconventional surgical practices of Dr. James C. Burt during his former service at St. Elizabeth Medical Center ("SEMC") in Dayton. Case No. 91-2079 involves the timeliness of claims asserted against SEMC for its alleged negligence in having granted and/or continued the staff membership or professional privileges of Dr. Burt and another former member of the SEMC medical staff, Dr. Max Blue, Jr.[1] This case also includes a claim for loss of consortium. Case No. 91-2121 involves the timeliness of a negligence action against SEMC for continuing Dr. Burt's staff membership or professional privileges at the hospital. The two cases have been consolidated sua sponte for decision. *See* (1992), 62 Ohio St.3d 1502, 583 N.E.2d 973.

Case No. 91-2079

{¶ 2} On April 17, 1989, Jimmie Dean Browning ("Browning") and her husband, Lawrence Browning, appellees, filed a complaint in the Court of Common Pleas of Montgomery County against Dr. Burt and appellants, SEMC and Dr. Blue.

_____

1. These claims are referred to by the parties as claims for "negligent credentialing."

Browning alleged that in February 1982, Drs. Burt and Blue negligently, willfully and wantonly performed unnecessary and experimental "vaginal reconstruction surgery" upon her without her consent, restructuring her genital organs to an unnatural and bizarre anatomical configuration. Browning alleged that she was advised by Blue that the surgery was necessary to treat a bladder condition. Browning also alleged that Blue negligently performed a total of sixteen unnecessary surgeries upon her between January 1981 and August 1986. Browning asserted that SEMC negligently, intentionally, and willfully permitted Drs. Burt and Blue to perform the unnecessary and experimental surgeries at SEMC by failing to provide adequate peer review of Drs. Burt and Blue, and by failing to protect Browning from known incompetent medical care.

{¶ 3} In her complaint, Browning sought recovery against Drs. Burt and Blue for medical malpractice. She sought recovery against SEMC for its alleged negligence in granting and/or continuing the staff membership or professional privileges of Drs. Burt and Blue. Lawrence Browning sought recovery against all defendants for loss of consortium.

{¶ 4} Dr. Burt failed to respond to the complaint and, upon motion, appellees obtained a default judgment against him.[2] SEMC and Dr. Blue, appellants, answered the complaint and asserted defenses based upon the "applicable statute of limitations." Appellants then deposed Browning in July 1989 for purposes of developing their statute of limitations defenses. The following relevant matters can be gleaned from Browning's deposition testimony.

{¶ 5} In 1980, Browning sought treatment from Dr. Blue, a urologist, for bladder infections and difficulties she experienced voiding urine. Blue performed surgery upon Browning, but Browning's condition did not improve. By 1982, Browning began complaining of constant bladder pain. She also complained of

---

2. A hearing for the assessment of damages was held in abeyance pending further court order.

pain she experienced during sexual relations with her husband. Thus, in February 1982, Blue referred her to Dr. Burt for an "exploratory pelvic laparotomy with lysis" and "vaginoplasty."

**{¶ 6}** Dr. Burt met with Browning prior to surgery. Burt explained to Browning that the pain she experienced during sexual relations was caused by her husband's penis striking her bladder. Burt explained that Drs. Burt and Blue would perform surgery to place her bladder upon a "pedestal," and that this procedure would correct her problems voiding urine and alleviate the pain she suffered during intercourse. Burt also indicated that he would do some "cosmetic things" to improve Browning's sex life.

**{¶ 7}** With respect to this special surgical procedure Burt performed at SEMC, a form letter was required by SEMC to be submitted to Burt's patients prior to surgery. A copy of the letter bearing Browning's signature (and a "witness" signature dated February 5, 1982) was presented by SEMC at Browning's deposition.[3] Browning testified that she could not recall having ever seen the letter. The form letter, which bears the SEMC letterhead, states:

"Dear Patient:

"The Executive Committee of the Medical Staff of St. Elizabeth Medical Center wishes to inform you that the 'female coital area reconstruction' surgery you are about to undergo is:

"1. Not documented by ordinary standards of scientific reporting and publication.

"2. Not a generally accepted procedure.

"3. As yet not duplicated by other investigators.

"4. Detailed only in non-scientific literature.

---

3. It is undisputed that the letter bearing Browning's signature appeared in her hospital records at SEMC.

"You should be informed that the Executive Committee of the Medical Staff considers the aforementioned procedure an unproven, non-standard practice of gynecology."[4]

{¶ 8} Drs. Burt and Blue performed "vaginal reconstruction surgery" upon Browning at SEMC in February 1982. Browning testified at the deposition that she underwent the surgery explained to her by Burt to correct her painful bladder condition.[5]

{¶ 9} Browning was required to employ an indwelling urinary catheter for six months following the reconstruction surgery. When the catheter was removed by Dr. Burt, Browning could not void properly and became "obstructed." The obstruction caused extreme pain and vomiting and subsequent hospitalization at SEMC. Browning testified that after her February 1982 "love surgery," she continued to suffer from bladder infections and developed problems with urinary incontinence. Her bladder infections after the surgery were worse (more frequent) than before. Additionally, following the surgery, Browning could not engage in sexual relations without extreme pain and difficulties. At some point, she also began to develop severe kidney problems, for which Dr. Blue provided treatment. Browning was last treated by Dr. Burt sometime in 1983. Burt left Browning a message that he was leaving town and that she need not see him anymore. Browning continued her treatment at SEMC with Dr. Blue.

---

4. An identical form letter appears in the record in case No. 91-2121. Answers to interrogatories in that case reveal that this "special Burt consent" form was used by SEMC beginning in 1979 in connection with Dr. Burt's "vaginal reconstruction surgeries." The forms were provided to Burt by SEMC and were required to be completed before or at the time of hospital admission. Burt began conducting vaginal reconstruction surgeries at SEMC in 1969.

5. The parties to this appeal agree that the surgery actually performed upon Browning consisted of an exploratory pelvic laparotomy, vaginal reconstruction, circumcision of the clitoris and insertion of a urinary catheter. The vaginal reconstruction consisted of, among other things, a redirection and elongation of her vagina. In her deposition, Browning claimed that she was not fully informed of the true nature of the surgery, although she admitted that her signature appeared on a consent form indicating that the surgical procedure "Pelvic Laparotomy, Vaginal Reconstruction" had been explained to her satisfaction.

{¶ 10} Browning underwent a myriad of additional surgeries performed by Dr. Blue at SEMC between 1982 and 1986. After each surgery, Dr. Blue told Browning that after the *next* surgery, she would be "just fine." The final surgery performed by Blue occurred on August 22, 1986, when he removed Browning's right kidney. However, none of these surgeries improved Browning's condition. Indeed, Browning stated that her condition worsened. She continued to suffer bladder infections, difficulties voiding, problems during sexual intercourse, and periods of urinary incontinence. She also developed bowel problems sometime during her treatment with Burt and/or Blue. After the August 22, 1986 surgery, Browning began experiencing right flank pain, and her mental health deteriorated.

{¶ 11} When her problems persisted, Browning arranged to be examined by Dr. Montague, a urologist, at the Cleveland Clinic. Browning went to see Montague for an explanation why her medical condition did not improve following Dr. Blue's August 1986 surgery. Montague examined Browning in June 1987 and, according to Browning:

"A. He told me that I was voiding pretty good and that he thought that I should go for some counseling because I wasn't willing to accept my condition or change my life-style or something. * * *

"Q. What did you tell Dr. Montague?

"A. I told him that I thought that something was wrong, you know, from the surgery I'd had, that I didn't get over it and when he [Blue] took my kidney out, I thought I wouldn't have any more problems."

{¶ 12} In June or July 1987, Montague sent a report of his examination to Browning and Blue. According to Browning, the report indicated there was a "flaw" in her surgery. Browning, who underwent approximately sixteen surgeries, did not know the surgery to which Dr. Montague was referring. She never questioned Montague about the report.

{¶ 13} Sometime between July and August 1987 (but after receiving the report from Cleveland Clinic), Browning confronted Dr. Blue in Blue's office. Browning told Blue that she thought Blue "had done a malpractice operation" because her medical condition was not improving. She also told Blue that before Dr. Burt left town in 1983, Burt had told Browning that half of Browning's prior surgeries were malpractice. Browning had had a number of surgeries before she last saw Burt in 1983 (including a number of surgeries not performed by Burt or Blue), but Browning assumed that Burt was referring to Blue's prior surgeries. Browning said that during the confrontation at Blue's office, Blue denied any wrongdoing and recommended that she see a psychiatrist.

{¶ 14} At Blue's suggestion, Browning entered SEMC for psychiatric treatment in August 1987 under the care of Dr. Patwa. According to Browning, Blue visited her at the hospital "because he wanted me to forget everything that letter said from Cleveland Clinic and I told him he was a liar." Blue tried to prescribe medication for Browning during this time, but Dr. Patwa would not allow it. Browning stated in her deposition that she began to suspect in August 1987 that Dr. Blue may have committed malpractice upon her. Browning never returned to see Dr. Blue for treatment after her August 1987 hospitalization. Browning told Dr. Patwa in August or September 1987 that Dr. Blue had ruined her life because Blue removed her kidney and she was not well, and never would be well.[6]

{¶ 15} On September 29, 1989, SEMC filed a motion for summary judgment, arguing that appellees' claims against SEMC, all of which arose from SEMC's alleged negligent credentialing of Drs. Burt and Blue, were time-barred by

---

6. Browning testified at the deposition that she continues to suffer from urinary incontinence, abdominal flank pain, severe bowel problems, severe anxiety and depression, chronic back pain, and pain during sexual intercourse to the point that she is virtually unable to participate in sexual relations with her husband. She testified that she was told by a gynecologist two months before the deposition that the surgery performed upon her could not be corrected, and that Dr. Burt "had cut away everything."

the one-year statute of limitations set forth in R.C. 2305.11(B)(1). Relying upon portions of the deposition testimony, SEMC argued, citing *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 538 N.E.2d 93, that the statute began to run by August 1987 at the latest when "cognizable events" occurred which should have led Browning to believe that her condition was related to her previous treatments with Burt and Blue, and which should have alerted Browning of the need to pursue her remedies. On November 3, 1989, Blue moved for summary judgment on Browning's malpractice claim and Lawrence Browning's consortium claim. For reasons similar to those advanced by SEMC, Blue argued that appellees' claims against him were barred by R.C. 2305.11(B)(1).

{¶ 16} Appellees responded to each motion for summary judgment and submitted an affidavit by Browning. The affidavit submitted in response to SEMC's motion (which is similar to the one submitted in response to Blue's motion) provides, in part:

"I saw the television program West 57th Street on October 30, 1988. I had the same symptoms as Dr. Burt's patients, which were on that show, complained of.

"I had surgery performed by Dr. Burt and Dr. Blue, and I wanted to know whether they had performed experimental surgery on me.

"* * *

"I did not know or believe prior to seeing the West 57th Street program, that the surgeries performed on me by Dr. Blue and Dr. Burt were unnecessary and/or experimental."

{¶ 17} The trial court granted the motions for summary judgment and dismissed the action against SEMC and Blue.[7] The trial court held that appellees'

---

7. The trial court granted SEMC's motion by decision dated December 5, 1989. All claims against SEMC were dismissed by entry dated January 3, 1990. The trial court granted Blue's motion by decision dated February 2, 1990, and the action against Blue was dismissed on March 6, 1990. The trial court's decisions granting SEMC's motion and Blue's motion are nearly identical.

claims accrued in August 1987 at the latest when Browning knew of Dr. Montague's report, knew of the continued and/or worsened nature of her condition, and told Blue that Blue had committed a "malpractice operation." The trial court held that under *Allenius*, *supra*, appellees were placed on notice (by a "cognizable event") in August 1987 to pursue any possible claims against SEMC and Blue, and because appellees did not do so within the one-year period of limitation, R.C. 2305.11 barred the action. By entry dated April 4, 1990, the trial court expressly determined that there was "no just cause for delay" of an appeal from the dismissals of the action against SEMC and Blue, leaving only the damages on appellees' default judgment against Dr. Burt to be adjudicated.

{¶ 18} On appeal, the court of appeals reversed the judgment of the trial court with respect to the dismissal of appellees' claims against SEMC. Applying the R.C. 2305.11(B)(1) statute of limitations, and the "cognizable event" test of *Allenius*, the court of appeals held that there was no evidence that appellees knew or should have known, prior to viewing the "West 57th" television program, that Browning may have been injured as a result of SEMC's negligence in credentialing Drs. Burt and Blue. Accordingly, the court of appeals held that summary judgment was inappropriate, as appellees' causes of action against SEMC may not have accrued until October 1988, and, thus, the action against SEMC (commenced in April 1989) may have been timely filed.

{¶ 19} The court of appeals affirmed the judgment of the trial court with respect to the dismissal of Browning's malpractice claim against Blue, finding that the cause of action accrued in August 1987 at the latest when Browning knew or should have known that she may have been the victim of medical malpractice. However, the court of appeals reversed the judgment of the trial court with respect to the dismissal of Lawrence Browning's consortium claim against Blue, finding that Lawrence's claim was governed by the four-year statute of limitations set forth in R.C. 2305.09.

Case No. 91-2121

{¶ 20} Coney Mitchell, appellee, underwent "vaginal reconstruction surgery" performed by Dr. Burt at SEMC in January 1985. Prior to surgery, Mitchell suffered from urinary incontinence, bladder infections, bladder and pelvic pain, vaginal infections, bowel problems, and painful sexual intercourse. Before surgery, Burt explained to Mitchell that her bladder was being bruised during sexual relations with her husband, and that surgery was necessary to "lift" her bladder "out of the way." Burt told Mitchell that the surgical procedure would alleviate her pelvic pain and correct her bladder problems. Mitchell signed a consent form for "Anterior Colporrhaphy, Vaginal Reconstruction, Cystoscopy." She also apparently signed the special form letter required by SEMC for Burt's vaginal reconstruction surgeries.[8]

{¶ 21} Mitchell's condition worsened within a short time after the surgery.[9] When the catheter was removed, Mitchell lost all bladder control. Her bladder pain and vaginal infections continued. She also began to experience severe bowel problems and felt like everything inside of her was "tearing loose." She "stayed sick," and her condition never improved.

{¶ 22} At Dr. Burt's urging, Mitchell and her husband attempted to resume sexual relations approximately four months after the reconstruction surgery. However, penetration was impossible and Mitchell began bleeding profusely. At this time, Mitchell examined her vagina and noticed that it had been "sewn up." She immediately contacted Burt, who indicated that everything was normal, and that she needed time to heal. Burt instructed Mitchell not to see any other doctor.

---

8. The contents of the form letter appears in the facts in case No. 91-2079, *supra*. It is undisputed that the letter bearing Mitchell's signature appeared in her hospital file at SEMC.

9. We surmise from the record that the procedure Mitchell underwent was similar to the surgery performed upon Browning, which included, among other things, vaginal redirection and elongation, insertion of a urinary catheter, and a general restructuring of body organs, muscle and tissue. See fn. 5, *supra*.

He told Mitchell that any other doctor could cause her to bleed to death. Thus, Mitchell continued treatments with Dr. Burt.

{¶ 23} During subsequent treatments, Burt continually insisted that Mitchell could resume normal sexual relations with her husband. However, Mitchell maintained that this was not possible. At some point, Burt met with Mitchell's husband and told him that Mitchell would get better, and he (Mitchell's husband) should not "take no for an answer." Eventually, in 1987, Mitchell had a heated argument with Burt and decided to terminate her treatment with him. Mitchell has never been able to resume sexual relations with her husband.

{¶ 24} In October 1988, Mitchell viewed the "West 57th" television program regarding Dr. Burt's surgical practices. She realized that her symptoms were the same as those discussed by Burt's ex-patients appearing on the show. Thus, Mitchell contacted a doctor, Dr. Busacco, whose name she obtained from watching the program. Mitchell was examined by Busacco in December 1988. Busacco performed whatever corrective surgery was possible—reinforcing the rectum, reconstructing the vagina, removing pockets of urine which had been collecting bacteria within the urinary system—but Busacco informed Mitchell that she had been surgically mutilated.

{¶ 25} Mitchell commenced suit on December 14, 1988 against Dr. Burt and appellant, SEMC. Mitchell alleged that Burt negligently and fraudulently performed inappropriate, unnecessary and experimental surgery upon her without her knowledge and consent. Mitchell alleged that SEMC knew of Burt's surgical practices and failed to protect her from a known incompetent physician. Mitchell also claimed that SEMC was negligent in failing to provide adequate peer review of Dr. Burt.

{¶ 26} Mitchell sought recovery from Dr. Burt for medical malpractice. She sought recovery from SEMC for its alleged negligence in granting and continuing hospital privileges to Dr. Burt.

{¶ 27} SEMC responded to the complaint and eventually moved for summary judgment on the basis of the R.C. 2305.11(B)(1) statute of limitations. Burt failed to answer (or defend against) the claim of medical malpractice.

{¶ 28} The trial court granted SEMC's motion for summary judgment. In its decision, the trial court noted that SEMC and Mitchell apparently assumed that all claims against SEMC were "medical claims" within the meaning of R.C. 2305.11(B)(1) and (D)(3). Applying *Allenius*, *supra*, the trial court held that the R.C. 2305.11(B)(1) period of limitations began to run in December 1985 at the latest. However, it is apparent that the trial court was unsure whether R.C. 2305.11(B)(1) was applicable. In dismissing the action against SEMC, the trial court stated, in part:

"The Court finds that an action upon a medical claim against St. Elizabeth Medical Center was not commenced within one year after the action accrued and therefore under R.C. 2305.11(B)(1) the claims should be DISMISSED. The Court further finds that the claims of the Plaintiff for bodily injury not related to a medical claim must be DISMISSED because the action was not brought within the two years after the cause thereof arose pursuant to R.C. 2305.10. This case was filed December 14, 1988."

{¶ 29} Subsequently, the trial court entered a default judgment against Burt and in favor of Mitchell. By separate entry, the trial court expressly determined that there was "no just cause for delay" of an appeal from the dismissal of the action against SEMC.

{¶ 30} On appeal, the court of appeals reversed the judgment of the trial court. The court of appeals determined that there was nothing in the record to suggest that Mitchell should have discovered the alleged negligence of SEMC prior to viewing the "West 57th" television program in October 1988. Accordingly, the court of appeals, relying on its decision in the *Browning* case, held that summary judgment was not appropriate.

**{¶ 31}** The two cases, having been consolidated, are now before this court pursuant to the allowance of motions to certify the record.

————————————

*Spangenberg, Shibley, Traci, Lancione & Liber*, *John G. Lancione*, *John D. Liber* and *Peter H. Weinberger*, for appellees Browning in case No. 91-2079 and appellee Mitchell in case No. 91-2121.

*Freund, Freeze & Arnold, Neil F. Freund* and *Robert N. Snyder*, for appellant Max Blue, Jr., M.D., in case No. 91-2079.

*Dinsmore & Shohl*, *Frank C. Woodside III*, *John E. Schlosser* and *K.C. Green*, for appellant St. Elizabeth Medical Center in case Nos. 91-2079 and 91-2121.

*Bricker & Eckler*, *James J. Hughes* and *Catherine M. Ballard*, urging reversal for *amicus curiae*, Ohio Hospital Association, in case Nos. 91-2079 and 91-2121.

————————————

**DOUGLAS, J.**

**{¶ 32}** The narrow issue in these consolidated cases is whether the negligent credentialing causes of action against SEMC for granting and continuing staff privileges to Dr. Burt (and Dr. Blue in case No. 91-2079) were timely filed pursuant to the applicable statute of limitations. Case No. 91-2079 involves additional issues concerning the court of appeals' reinstatement of Lawrence Browning's consortium claim against Dr. Blue and SEMC.[10] Given the procedural disposition of these cases, the pertinent facts (where applicable) must be construed in a light most favorable to appellees who opposed the motions for summary judgment at the trial court level. See Civ. R. 56.

_____

10. The malpractice of Dr. Burt has been established in both cases by virtue of the default judgments entered against him even *if* the causes of action for malpractice against Dr. Burt were untimely filed. Browning did not appeal to this court from the determination that her malpractice action against Dr. Blue was untimely filed and, thus, the judgment of the court of appeals on that issue is final.

I

Hospital Liability/Negligent Credentialing

{¶ 33} SEMC appeals in both cases, urging that the claims asserted against it for negligent credentialing are time-barred by R.C. 2305.11(B)(1). Specifically, SEMC suggests that the court of appeals erred in determining that discovery (by appellees Mitchell and Browning) of the hospital's negligence was necessary to commence the running of the R.C. 2305.11(B)(1) period of limitations on the negligent credentialing claims. SEMC asserts that the "cognizable events" triggering the running of the statute of limitations on Mitchell's and Browning's medical malpractice claims against the doctor(s) were sufficient to commence the running of the period of limitations on their negligent credentialing causes of action against the hospital.

{¶ 34} In support of its position, SEMC cites *Allenius*, *supra*, and a number of our other cases such as *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438, *Richards v. St. Thomas Hosp.* (1986), 24 Ohio St.3d 27, 24 OBR 71, 492 N.E.2d 821, *Hoffman v. Davidson* (1987), 31 Ohio St.3d 60, 31 OBR 165, 508 N.E.2d 958, *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, and *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 589 N.E.2d 1284. This line of cases deals with the accrual of causes of action for *medical malpractice* under R.C. 2305.11, and the necessity of investigation and pursuit of remedies when a medical condition and its relationship to a previous medical procedure, treatment or diagnosis are "discovered."

{¶ 35} Conversely, appellees contend that under *Allenius*, *supra*, the "West 57th" television program was the "cognizable event" which commenced the running of the R.C. 2305.11(B)(1) period of limitations on the negligent credentialing causes of action. Thus, appellees assert that Mitchell's and Browning's claims against SEMC were filed within the R.C. 2305.11(B)(1) period of limitations.

**{¶ 36}** Upon reflection, we cannot accept either of the parties' positions, which assume that R.C. 2305.11(B)(1) and our cases governing the accrual of causes of action for *medical malpractice* apply to claims of hospital liability for negligent credentialing.

**{¶ 37}** The theory of hospital liability at issue in these cases was discussed at some length in *Albain v. Flower Hosp.* (1990), 50 Ohio St. 3d 251, 257-260, 553 N.E.2d 1038, 1044-1047. In *Albain*, paragraph two of the syllabus, this court held that:

"In regard to staff privileges, a hospital has a *direct duty* to grant and to continue such privileges only to competent physicians. * * * In order to recover for a breach of this duty, a plaintiff injured by the negligence of a staff physician must demonstrate that but for the lack of care in the selection or the retention of the physician, the physician would not have been granted staff privileges, and the plaintiff would not have been injured." (Emphasis added.)

**{¶ 38}** The general duty imposed upon hospitals to grant and continue staff privileges only to competent physicians was identified in *Albain* as an "independent" duty of care owed *directly* to those admitted to the hospital. *Id.* at 257-260, 553 N.E.2d at 1044-1047. *See*, *also*, *Taylor v. Flower Deaconess Home & Hosp.* (1922), 104 Ohio St. 61, 135 N.E. 287. One of the areas in which the hospital owes the independent and direct duty to a patient is in establishing (and adhering to) reasonable peer review procedures:

"* * * [O]nce a competent and careful physician has been granted staff privileges, the hospital will not thereafter be liable unless it had reason to know that the act of malpractice would most likely take place. That is, where a previously competent physician with staff privileges develops a pattern of incompetence, which the hospital should become aware of through its peer review process, the hospital must stand ready to answer for its retention of such physician." (Footnote omitted.) *Albain*, at 258, 553 N.E.2d at 1045.

{¶ 39} In addition, the majority in *Albain* quoted with approval the following statement:

"'* * * [A hospital] is not required to pass upon the efficacy of treatment; it may not decide for a doctor whether an operation is necessary, or, if one be necessary, the nature thereof; but it owes to every patient whom it admits the duty of saving him from an illegal operation [or] false, fraudulent, or fictitious medical treatment.'" *Albain*, at 259, 553 N.E. 2d at 1046, quoting *Hendrickson v. Hodkin* (1937), 250 A.D. 619, 621, 294 N.Y.S. 982, 984-985 (Lazansky, P.J., dissenting), reversed (1937), 276 N.Y. 252, 11 N.E.2d 899.

{¶ 40} The complaints against SEMC in the cases before us allege that the hospital breached these independent duties owed directly to Browning and Mitchell as patients at SEMC. The "negligent credentialing" causes of action include allegations that SEMC failed to exercise prudence in granting or continuing staff privileges, failed to conduct reasonable peer review, failed to protect appellees Mitchell and Browning from known incompetent medical care, and otherwise failed to save appellees Mitchell and Browning from medical treatment (surgery) of an unnecessary and experimental nature. These claims are not claims for *medical malpractice* and, thus, the medical malpractice line of cases and the "cognizable event" test do not apply. A hospital does not practice medicine and is incapable of committing malpractice. See, generally, *Lombard v. Good Samaritan Med. Ctr.* (1982), 69 Ohio St.2d 471, 23 O.O.3d 410, 433 N.E.2d 162, and *Richardson v. Doe* (1964), 176 Ohio St. 370, 27 O.O.2d 345, 199 N.E.2d 878 (only physicians can commit "medical malpractice"). Further, appellees' claims against the hospital have nothing to do with any issue concerning derivative liability of the hospital for the acts of its agent or employee-physicians. The question whether Burt or Blue is employed by SEMC is neither clear on the record before us nor particularly relevant to our discussion. Mitchell's and Browning's negligent credentialing claims against SEMC are independent claims asserted directly against SEMC for the *hospital's*

own acts or omissions in granting and/or continuing the staff privileges of the doctor(s). Thus, we must determine what type of claim is being asserted by Browning and Mitchell against SEMC and, in addition, what statute of limitations applies to such claims.

## II

### Medical Claim -- R.C. 2305.11(B)(1) and (D)(3)

{¶ 41} R.C. 2305.11(B)(1) provides, in part:

"* * * [A]n action upon a medical * * * claim shall be commenced within one year after the action accrued * * *."

{¶ 42} R.C. 2305.11(D)(3) provides, in part:

"'Medical claim' *means any claim that is asserted in any civil action against a* physician, podiatrist, or *hospital*, against any employee or agent of a physician, podiatrist, or hospital, or against a registered nurse or physical therapist, *and that arises out of the medical diagnosis, care, or treatment of any person*. * * *" (Emphasis added.)

{¶ 43} A careful reading of R.C. 2305.11(B)(1) and (D)(3)[11] demonstrates that not all claims asserted against a hospital are "medical claims" subject to the period of limitations set forth in R.C. 2305.11(B)(1). Rather, a claim against a hospital is a "medical claim" within the meaning of R.C. 2305.11(D)(3), and is subject to the one-year limitation period set forth in R.C. 2305.11(B)(1), only if the claim arises out of the medical diagnosis, care, or treatment of a person. The terms "medical diagnosis" and "treatment" are terms of art having a specific and particular meaning relating to the identification and alleviation of a physical or mental illness, disease, or defect. See, generally, Black's Law Dictionary (6 Ed. 1990), at 453-454 and 1502. Conversely, the word "care" is a general word without a specific legal meaning until placed in a particular context. Under the *ejusdem generis* rule of

---

11. The current version of R.C. 2305.11(B)(1) and (D)(3) has remained unchanged since the amendment to R.C. 2305.11 effective October 20, 1987. See 142 Ohio Laws, Part II, 3322-3325.

statutory construction, "care" as used in R.C. 2305.11(D)(3) (where the word is preceded by terms such as "physician," "hospital," "nurse," and "medical diagnosis") means the prevention or alleviation of a physical or mental defect or illness. Thus, the term "care" in R.C. 2305.11(D)(3) should not be broadly interpreted when the context in which it is used is properly understood.

{¶ 44} With the foregoing discussion in mind, we believe that claims asserted against a hospital for negligent credentialing do not arise out of the medical diagnosis, care, or treatment of a person. Negligent credentialing claims arise out of the *hospital's* failure to satisfy its independent duty to grant and continue staff privileges only to competent physicians. This independent duty does not directly involve diagnosis or the medical care and treatment of a patient. While the acts or omissions of a hospital in granting and/or continuing staff privileges to an incompetent physician *may* ultimately lead to an act of medical malpractice by the incompetent physician, the physician's ultimate act of medical malpractice is factually and legally severable and distinct from the hospital's acts or omissions in negligently credentialing him or her with staff membership or professional privileges.

{¶ 45} Accordingly, we conclude that an action against a hospital for bodily injury arising out of the hospital's negligence in credentialing a physician is neither "malpractice" nor a "medical claim" to which the limitations period found in R.C. 2305.11 applies.[12]

III

---

12. We reach this conclusion no matter which of the many previous versions of R.C. 2305.11 is considered. Prior to the October 1987 amendment to R.C. 2305.11 (142 Ohio Laws, Part II, 3322-3325), former versions of R.C. 2305.11(A) provided, in part, that "[a]n action for * * * malpractice, including an action for malpractice against a * * * hospital, * * * shall be brought within one year after the cause thereof accrued * * *." See 141 Ohio Laws, Part II, 3228; 139 Ohio Laws, Part I, 2153; 136 Ohio Laws, Part II, 3841; and 136 Ohio Laws, Part II, 2810. Again, a hospital does not practice medicine and cannot commit "malpractice." *Lombard* and *Richardson*, *supra*.

Discovery Rule—R.C. 2305.10

**{¶ 46}** If a negligent credentialing cause of action is not a claim for malpractice or a medical claim, the obvious question becomes: What is it? It is, simply, a claim for bodily injury arising out of negligence which is not covered by the limitation periods found in R.C. 2305.11. Thus, we look to R.C. 2305.10, which provides in part:

"An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose."

**{¶ 47}** A cause of action for negligent credentialing of a physician by a hospital which results in bodily injury is an action falling under the umbrella of R.C. 2305.10.

**{¶ 48}** Pursuant to R.C. 2305.10, the two-year period of limitations begins to run when a cause of action for bodily injury "arose," while the R.C. 2305.11(B)(1) statute of limitations for "medical claims" begins to run when a cause of action "accrued." However, we believe that the terms "arose" and "accrued" are synonymous and that the rule of discovery long recognized in Ohio as applicable to the "accrual" of causes of action should be applied to the R.C. 2305.10 statute of limitations for claims of hospital *negligence* in credentialing a physician.

**{¶ 49}** The history of the so-called discovery rule in Ohio is long and storied. The rule of discovery was originally recognized by this court in the medical malpractice context, but the rule has been generally accepted and applied in numerous areas of the law. See *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 223-227, 574 N.E.2d 457, 464-467 (Douglas, J., dissenting). Of particular significance, the discovery rule has been judicially applied to the general statute of limitations for bodily injury actions under former R.C. 2305.10. In *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 4 OBR 335, 447 N.E.2d 727, paragraphs one and two of the syllabus, this court held that:

"1. Absent legislative definition, it is left to the judiciary to determine when a cause 'arose' for purposes of statutes of limitations.

"2. When an injury does not manifest itself immediately, the cause of action does not arise until the plaintiff knows or, by the exercise of reasonable diligence should have known, that he had been injured by the conduct of defendant, for purposes of the statute of limitations contained in R.C. 2305.10."

{¶ 50} *O'Stricker* was decided under a version of R.C. 2305.10 in effect prior to the 1980 amendment to the statute. The 1980 amendment to R.C. 2305.10 specifically adopted a discovery rule for bodily injury actions caused by exposure to asbestos and chromium. 138 Ohio Laws, Part II, 3412. In *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 609 N.E.2d 140, where a discovery rule provided by the General Assembly for DES-related injuries was found to be insufficient, we again had occasion to announce that a discovery rule applies to the R.C. 2305.10 general statute of limitations for bodily injury actions. Here, we extend the discovery rule to bodily injury actions resulting from a hospital's negligence in credentialing a physician.

IV

"Cognizable Event"

{¶ 51} Although not directly applicable to the claims of hospital negligence in the cases before us, the rule of discovery for the accrual of causes of action for medical malpractice under R.C. 2305.11 was explained in *Allenius*, *supra*, as requiring the occurrence of a "cognizable event" "which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies." *Id.* at syllabus.

{¶ 52} Today, we *borrow* from *Allenius* in constructing a rule of discovery applicable to R.C. 2305.10 for bodily injury actions arising from negligent credentialing by a hospital. We emphasize, however, that *Allenius* and our cases governing the accrual of causes of action for medical malpractice are not applicable to causes of action for hospital negligence in credentialing a physician. By its very nature, the discovery rule (concept) must be specially tailored to the particular context in which it is to be applied. Our decisions concerning the accrual of causes of action for medical malpractice are not applicable to determine the accrual date of claims not related to the medical malpractice of a physician.

{¶ 53} The court of appeals found that the critical inquiry for determining the accrual date of the negligent credentialing causes of action requires pinpointing when the victims should have discovered that SEMC had failed to "provide adequate supervision or review of" Dr. Burt (and Dr. Blue in the *Browning* case). The court of appeals found no evidence that Mitchell or Browning discovered or should have discovered that SEMC had failed to perform its legal duties until the women viewed the television program in October 1988 and realized that other former patients of Dr. Burt suffered from maladies similar to their own. Thus, the court of appeals held that summary judgment on  the basis of the R.C.

2305.11(B)(1) statute of limitations was not proper in either case, since the complaints were filed within one year of the discovery of pertinent facts which placed appellees on notice to pursue a remedy against the hospital.

{¶ 54} We agree with the court of appeals that in both cases the October 1988 television program was the event which triggered the running of the statute of limitations on Browning's and Mitchell's claims against SEMC—although it is the R.C. 2305.10 period of limitations which should have been applied. The court of appeals was absolutely correct in recognizing that the facts or events which might trigger the running of the statute of limitations for *medical malpractice claims against a doctor* do not necessarily commence the running of a statute of limitations on claims against a *hospital for hospital negligence* unrelated to the medical diagnosis, care, or treatment of a person. We, mildly and respectfully, disagree with the court of appeals to the extent that it found the "cognizable event" test of *Allenius* to be directly applicable in determining the accrual date of appellees' negligent credentialing claims. Mere mention of *Allenius* and the "cognizable event" test conjures up images of medical malpractice (to anyone who is familiar with our cases in this area) which may be one reason for the confusion in the court of appeals, resulting in application of the wrong statute of limitations to appellees' causes of action for hospital negligence.

V

"Alerting Event"

{¶ 55} In tailoring a rule of discovery applicable to R.C. 2305.10 for bodily injury actions arising from negligent credentialing by a hospital, we hold that a cause of action for negligent credentialing arises when the plaintiff knows or should know that he or she was injured as a result of the hospital's negligent credentialing procedures or practices. In our judgment, the only evidence of any perspicuous event which should have alerted appellees Browning and Mitchell to pursue their negligence claims against SEMC occurred in October 1988. Upon viewing a

television program, Browning and Mitchell became aware that many of Burt's ex-patients suffered from abnormalities similar to their own as a consequence of Burt's surgical practices at SEMC. The record is devoid of evidence that appellees knew or should have known prior to October 1988 that SEMC may have done something wrong in granting or continuing privileges to Dr. Burt or Blue. The "special Burt consent" form in Browning's and Mitchell's hospital records would not have apprised Mitchell and Browning that their doctor(s) may have committed a number of harmful, improper or unwarranted surgeries upon a number of unsuspecting patients such that SEMC's credentialing practices could reasonably be brought into question. Accordingly, the R.C. 2305.10 statute of limitations was triggered in October 1988, and the complaints against SEMC were filed well within the applicable two-year period of limitations.[13]

{¶ 56} Obviously, we do not hold that a television program like the one at issue in these cases is necessary to trigger the running of the R.C. 2305.10 statute of limitations in every case of negligent credentialing. It is sufficient if a plaintiff discovers or, through the exercise of reasonable diligence, should have discovered some definitive information that would reasonably warrant investigation of the hospital's credentialing practices. Such an occurrence might be termed an "alerting event," if for no other reason than to contrast the occurrence triggering the commencement of the statute of limitations for negligence in R.C. 2305.10 from the "cognizable event" of R.C. 2305.11 limitation periods. However, discovery of a physician's medical malpractice does not, in itself, constitute an "alerting event" nor does such discovery implicate the hospital's credentialing practices or require investigation of the hospital in this regard. To hold otherwise would encourage

---

13. It is interesting to note that even if Browning's negligent credentialing claims against SEMC accrued in August 1987 as the trial court suggested, the action would still have been timely filed against SEMC under the applicable two-year period of limitations.

baseless claims of negligent credentialing and a hospital would be named in nearly every lawsuit involving the malpractice of a physician.

VI

R.C. 2305.25

**{¶ 57}** SEMC and *amicus curiae*, Ohio Hospital Association, suggest that hospitals are immune from liability for the acts, omissions and decisions of their peer review committees by virtue of R.C. 2305.25 and that, therefore, a hospital cannot be liable for negligent peer review.  We reject this argument.

**{¶ 58}** R.C. 2305.25 provides, in part:

"*No hospital*, no state or local society, and no individual *who is a member* or employee *of any of the following committees shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of the committee*:

"* * *

"(E)  A peer review committee, professional standards review committee, or arbitration committee of a state or local society composed of doctors of medicine, doctors of osteopathic medicine and surgery, doctors of dentistry, doctors of optometry, doctors of podiatric medicine, psychologists, or registered pharmacists[.]"  (Emphasis added.)

**{¶ 59}** Following a listing of the specific review boards and committees, R.C. 2305.25 provides that:

"Nothing in this section shall relieve any individual or hospital from liability arising from treatment of a patient.

"This section shall also apply to any member or employee of a nonprofit corporation engaged in performing the functions of a peer review committee of nursing home providers or administrators or of a peer review or professional standards review committee.  No person who provides information under this section and provides such information without malice and in the reasonable belief

24

that such information is warranted by the facts known to him shall be subject to suit for civil damages as a result thereof."

{¶ 60} The purposes of R.C. 2305.25 are clear. The statute extends limited protection to those who provide information to certain review boards and committees to encourage the free flow of information without threat of reprisal in the form of civil liability. See, generally, *Jacobs v. Frank* (1991), 60 Ohio St.3d 111, 113, 573 N.E.2d 609, 612. The statute also seeks to protect those serving on committees and committee employees for the obvious reason that it could be difficult to staff a committee absent such protections. However, the cases at bar do not involve a situation where SEMC has been either the provider of information to a committee (see, *e.g.*, R.C. 1742.141), or the participant on a committee. It is clear to us that R.C. 2305.25 does not provide blanket immunity to a hospital for negligence in granting and/or continuing staff privileges of an incompetent physician.

{¶ 61} SEMC protests that R.C. 2305.25 and 2305.251 prevent a hospital from defending itself against claims for negligent peer review. According to SEMC, these statutes require that no evidence as to any matter brought to the attention of peer review committees, or actions taken by those committees, can be introduced into evidence in the hospital's defense. We reject SEMC's contentions for a number of reasons, but quoting from the following portion of R.C. 2305.251 should dispel any notion that SEMC's arguments are meritorious:

"* * * Information, documents, or records otherwise available from original sources are not to be construed as being unavailable for discovery or for use in any civil action merely because they were presented during proceedings of a committee nor should any person testifying before a committee or who is a member of the committee be prevented from testifying as to matters within his knowledge, but the witness cannot be asked about his testimony before the committee or opinion formed by him as a result of the committee hearing."

VII

Summary of Holdings re Claims Against SEMC

**{¶ 62}** In summarizing our discussion concerning the claims against SEMC, we hold that:

1. Hospital negligence arising out of the "care" of a patient is a "medical claim" within the meaning of R.C. 2305.11(D)(3) and is subject to the period of limitations set forth in R.C. 2305.11(B)(1). "Care" as used in R.C. 2305.11(D)(3) is the prevention or alleviation of a physical or mental defect or illness.

2. Negligent credentialing of a physician by a hospital is not "medical diagnosis, care, or treatment" within the meaning of R.C. 2305.11.

3. An action against a hospital for bodily injury arising out of the negligent credentialing of a physician is subject to the two-year limitations period set forth in R.C. 2305.10.

4. The period of limitations set forth in R.C. 2305.10 commences to run when the victim knows or should have discovered that he or she was injured as a result of the hospital's negligent credentialing procedures or practices.

5. R.C. 2305.25 does not provide a hospital with immunity from liability for the hospital's negligence in granting and/or continuing the staff privileges of an incompetent physician.

**{¶ 63}** For the reasons stated herein, which differ, in part, from the reasoning of the court of appeals, we affirm the court of appeals' judgment in case No. 91-2121 (Mitchell) and that portion of the court of appeals' judgment in case No. 91-2079 (Browning) which reversed the judgment of the trial court with respect to the dismissal of the action against SEMC.[14]

---

14. Lawrence Browning's consortium action against SEMC, premised upon SEMC's alleged negligence in credentialing Drs. Burt and Blue, was timely filed and we reject SEMC's arguments to the contrary.

VIII

Consortium Claim of Lawrence Browning Against Blue

{¶ 64} The only remaining question before us concerns the appeal of Dr. Blue in case No. 91-2079 (Browning) regarding the reinstatement of Lawrence Browning's consortium claim against Blue. For the reasons that follow, we affirm the judgment of the court of appeals.

{¶ 65} Blue contends that Lawrence Browning did not appeal to the court of appeals and, thus, the appellate court had no jurisdiction to reverse the judgment of the trial court on any issue relating to Lawrence's claim against Blue. However, the record does not support this contention and, therefore, we reject Blue's argument.

{¶ 66} Blue also suggests that the court of appeals abused its discretion in finding that the R.C. 2305.09 statute of limitations applied to Lawrence's consortium claim against Blue, since no party briefed or argued the issue or raised the question in an assignment of error to the court of appeals. We find no abuse of discretion. The law is clear that spousal consortium claims arising from medical malpractice are governed by the R.C. 2305.09(D) four-year period of limitations, when the principal claim for malpractice accrued, as it did here, prior to the effective date of the October 1987 amendment to R.C. 2305.11. *Hershberger*, *supra*, 34 Ohio St. 3d at 6, 516 N.E.2d at 208.[15] Furthermore, the issue decided by the court of appeals did not involve the constitutionality of a statute and, thus, the case of *State v. 1981 Dodge Ram Van* (1988), 36 Ohio St.3d 168, 522 N.E.2d 524, is distinguishable. A number of other cases cited by Blue merely recite the general rule of law that issues may be treated as waived if not raised at the first opportunity

---

15. In this regard, we note that the October 1987 amendment to R.C. 2305.11 specifically made certain derivative claims subject to the same period of limitations as the principal claim. *See* R.C. 2305.11(D)(3); 142 Ohio Laws, Part II, at 3324.

or assigned as error in the court of appeals. However, there is no general prohibition in App. R. 12(A) requiring that issues be treated as waived.

{¶ 67} Finally, Blue suggests that even under the R.C. 2305.09 statute of limitations, Lawrence Browning's action against Blue for loss of consortium was untimely filed. Specifically, Blue urges that Mrs. Browning's malpractice claim against Blue "accrued" within the meaning of R.C. 2305.11 as early as 1983 and, thus, Lawrence Browning had four years from that time to commence suit against Blue, but failed to do so. However, Mrs. Browning's malpractice claim against Blue was found by the trial court and court of appeals to have accrued in August 1987 at the latest. Since the R.C. 2305.09(D) four-year period of limitations on Lawrence's claim against Blue commenced to run on the same date that the R.C. 2305.11 one-year period of limitations began to run on Browning's malpractice claim against Blue, *Hershberger*, *supra*, paragraph two of the syllabus, Lawrence's claim was timely filed. This is especially true given the fact that Browning continued her treatment with Blue until August 1987. *See Frysinger v. Leech* (1987), 32 Ohio St.3d 38, 512 N.E.2d 337, paragraph one of the syllabus.

IX

Conclusion

{¶ 68} In reaching our conclusions, we do not pass judgment (since issues of alleged liability are yet to be determined) on Dr. Blue or SEMC, although it is tempting to do so given what the record shows has happened to these two women. Perhaps now they, and others, will have their day in court, where the conspiracy of silence in the local medical community which permitted the atrocities to be committed, and the atrocities themselves, can be more fully explored. Further, nothing in our opinion should be read to stand in the way of the proper performance of progressive medicine.

{¶ 69} For all the reasons set forth herein, we affirm the difficult and courageous judgments of the court of appeals.

*Judgments affirmed.*

A.W. SWEENEY, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., WRIGHT and COOK, JJ., concur in part and dissent in part.

DEBORAH L. COOK, J., of the Ninth Appellate District, sitting for RESNICK, J.

_____

**MOYER, C.J., concurring in part and dissenting in part.**

**{¶ 70}** I concur with the majority's disposition of Lawrence Browning's consortium claim against Dr. Blue. However, I respectfully dissent from the majority opinion because (1) a "negligent credentialing" cause of action is a "medical claim" and is subject to the one-year limitations period set forth in former R.C. 2305.11, and (2) plaintiffs' claims against St. Elizabeth Medical Center ("SEMC") had already accrued and were time-barred by the time plaintiffs viewed the "West 57th" television program.

I

**{¶ 71}** Because the majority's newly styled "negligent credentialing" cause of action is created from the language of a previous decision of this court, it is important to first consult that language before analyzing the cases *sub judice*. In *Albain v. Flower Hosp.* (1990), 50 Ohio St.3d 251, 553 N.E.2d 1038, we recognized, as an exception to the independent contractor rule, the right of a plaintiff to hold an employer directly liable for injuries proximately caused by the employer's own negligence in selecting or retaining an independent contractor. We applied this rule to the hospital setting and held that a hospital can be held liable for the medical malpractice of a staff physician where the injured party can prove that the hospital was negligent in granting or in continuing the staff privileges of the independent physician. Paragraph two of the syllabus of that decision reads:

"In regard to staff privileges, a hospital has a direct duty to grant and to continue such privileges only to competent physicians. A hospital is not an insurer

of the skills of private physicians to whom staff privileges have been granted. In order to recover for a breach of this duty, a plaintiff injured by the negligence of a staff physician must demonstrate that *but for the lack of care in the selection or the retention of the physician, the physician would not have been granted staff privileges, and the plaintiff would not have been injured.*" (Emphasis added.)

{¶ 72} The above-emphasized language underscores a crucial point underemphasized by the majority's opinion: under *Albain*, claims against a hospital for negligent retention or selection of a staff physician are dependent on an underlying medical malpractice claim against the staff physician. In order to prevail in a cause of action for negligent credentialing against a hospital pursuant to *Albain*, the plaintiff must establish not only negligent selection and/or retention of a physician, but also that but for the hospital's negligence, the plaintiff would not have been injured. That is, *Albain* requires that the underlying malpractice of the physician be proven before the plaintiff can recover damages against the hospital for its own negligence. Without an underlying harm to the hospital's patient through medical malpractice, an action against the hospital for negligent credentialing will never arise. Although medical malpractice claims against the doctor and negligent credentialing claims against the hospital are separate causes of action, with separate and distinct duties owed to a singular class of individuals, both causes of action fail without proof that the physician's failure to abide by ordinary standards of care proximately caused the patient's harm.

{¶ 73} Having failed to fully appreciate the significance of the interdependence between the negligent credentialing claims and the underlying malpractice claims, the majority has also erroneously held that a negligent credentialing cause of action is subject to the two-year limitations period set forth in R.C. 2305.10, rather than the one-year period found in former R.C. 2305.11.[16]

---

16. Current R.C. 2305.11(B)(1), unlike the former version of the statute, specifically states that an action on a "medical *** claim" (like those actions based upon a dental, optometric, or chiropractic

{¶ 74} Under the version of R.C. 2305.11 in effect at the time the plaintiffs' causes of action arose, "medical claim" was defined in R.C. 2305.11(D)(3) as "any claim asserted in any civil action against a physician, podiatrist, or hospital *arising out of* the diagnosis, care, or treatment of any person." (Emphasis added.) 139 Ohio Laws, Part I, 2154. Although former R.C. 2305.11 did not explicitly state that a "medical claim" is subject to the one-year limitations period contained in former R.C. 2305.11(A), I believe that the one-year statute of limitations is nonetheless applicable. As Justice Holmes correctly explained in his dissent in *Lombard v. Good Samaritan Med. Ctr.* (1982), 69 Ohio St.2d 471, 475-476, 23 O.O.3d 410, 413, 433 N.E.2d 162, 165, the General Assembly intended the words "malpractice" and "medical claim" to be used interchangeably:

"*** The second paragraph of R.C. 2305.11(A) allows one to serve written notice, prior to expiration of the time in R.C. 2305.11(A), upon a person and extend the time in which a suit may be brought against that person by up to 180 days from the time notice is given. This paragraph does not refer at all to malpractice. Rather, it uses the phrase 'medical claim.' This is evidence that the General Assembly considered the words 'malpractice' and 'medical claim' to be synonymous, for if the legislative intent was to give these words different meanings, it would make little sense to include actions such as the present one in a subsection that did not apply to them."

---

claim) is required to be commenced within one year after the action accrued. Under R.C. 2305.11(D)(3), "medical claim" includes claims which seek to hold a hospital responsible for its own torts as well as those alleging the hospital is vicariously liable for the wrongful acts of its employees and agents. In both cases, the claim must be one that "*arises out of* the medical diagnosis, care, or treatment of any person" before the one-year limitations period is applicable. (Emphasis added.) R.C. 2305.11(D)(3) reads:

"'Medical claim' means any claim that is asserted in any civil action against a physician, podiatrist, or hospital, against any employee or agent of a physician, podiatrist, or hospital, or against a registered nurse or physical therapist, and that *arises out of the medical diagnosis, care, or treatment of any person*. 'Medical claim' includes derivative claims for relief that arise from the medical diagnosis, care, or treatment of a person." (Emphasis added.)

**{¶ 75}** I would, therefore, hold that a negligent credentialing cause of action against a hospital, like a medical malpractice lawsuit brought against a physician, is subject to the one-year statute of limitations of R.C. 2305.11. Claims asserted against a hospital for negligent credentialing do *arise out of* a patient's medical diagnosis, care, or treatment. In every instance, the plaintiff-patient is alleging that the staff physician has rendered him or her substandard diagnosis, care, or treatment which proximately resulted in plaintiff's alleged injuries. The negligent credentialing claim against the hospital would not have arisen but for the underlying medical malpractice. Accordingly, the instant actions against the hospital are "medical claim[s]" within the meaning of former R.C. 2305.11(D)(3) and the plaintiffs had one year from the time of accrual in which to file their lawsuits.

II

**{¶ 76}** What remains to be determined is the proper accrual date of the plaintiffs' negligent credentialing causes of action against SEMC. Our prior decisions establish that a cause of action for medical malpractice accrues when the patient discovers or, in the exercise of reasonable care, should have discovered the resulting injury, or when the physician-patient relationship for that condition terminates, whichever occurs later. *Frysinger v. Leech* (1987), 32 Ohio St.3d 38, 512 N.E.2d 337, syllabus. The term "cognizable event" was used in *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 538 N.E.2d 93, to identify the point in time when the patient in fact discovers or reasonably should have discovered the resulting injury. *Allenius* cited the following language of *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438, paragraph one of the syllabus: "'Under R.C. 2305.11(A), a cause of action for medical malpractice accrues and the statute of limitations commences to run when the patient discovers, or, in the exercise of reasonable care and diligence should have discovered, the resulting injury.'" *Allenius*, *supra*, at 133, 538 N.E.2d at 95.

**{¶ 77}** Therefore, a "cognizable event" is an occurrence "which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies." *Allenius*, *supra*, at syllabus. Concurring in that opinion in order to emphasize that it is discovery of the physical injury—not discovery of the legal claim—which triggers the statute of limitations, I stated:

"[I]n determining when the statute of limitations is triggered, '"[t]he test is whether the plaintiff has information of circumstances sufficient to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his or her investigation."' *** As indicated by the majority, it is a cognizable event such as the occurrence of pain or injury '*** rather than knowledge of its legal significance that starts the running of the statute of limitations.'" *Allenius*, *supra*, at 135, 538 N.E.2d at 97.

**{¶ 78}** That proposition was recognized in a later decision by this court in *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 549, 589 N.E.2d 1284, 1287-1288:

"Moreover, *constructive* knowledge of facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running under the discovery rule. *** A plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations. *** Rather, the 'cognizable event' itself puts the plaintiff on notice to investigate the facts and circumstances relevant to her claim in order to pursue her remedies. ***" (Emphasis *sic*.)

**{¶ 79}** The facts or circumstances which give rise to a "cognizable event" for purposes of discovery of a medical malpractice claim do not automatically give rise to a claim against a hospital for negligent credentialing. "A physician's negligence does not automatically mean that the hospital is liable, and does not

raise a presumption that the hospital was negligent in granting the physician staff privileges." *Albain*, *supra*, at 258-259, 553 N.E.2d at 1046. As noted by the majority, the statute of limitations for negligent credentialing begins to run when the "plaintiff discovers or, through the exercise of reasonable diligence, should have discovered some definitive information that would reasonably warrant investigation of the hospital's credentialing practices." Here, the majority has followed the lead of the court of appeals in determining that there was no evidence before the trial court that the plaintiffs knew or should have known that the hospital had failed to perform its legal duty toward them until plaintiffs viewed the "West 57th" television show. I strongly disagree because I believe the plaintiffs had earlier notice of SEMC's negligence in granting staff privileges to the defendant-physicians.

{¶ 80} The record indicates that both Browning and Mitchell signed the following acknowledgement on SEMC letterhead prior to having Dr. Burt perform vaginal reconstruction surgery:

"Dear Patient:

"The Executive Committee of the Medical Staff of St. Elizabeth Medical Center wishes to inform you that the 'female coital area reconstruction' surgery you are about to undergo is:

"1. Not documented by ordinary standards of scientific reporting and publication.

"2. Not a generally accepted procedure.

"3. As yet not duplicated by other investigators.

"4. Detailed only in non-scientific literature.

"You should be informed that the Executive Committee of the Medical Staff considers the aforementioned procedure an unproven, non-standard practice of gynecology."

{¶ 81} The majority completely overlooks the impact of the signed consent form in determining when the plaintiffs' negligent credentialing causes of action against SEMC accrued. Instead, the majority holds that plaintiffs' causes of action accrued no earlier than the date Browning and Mitchell viewed the "West 57th" television program. In this regard, the majority asserts that notice of a hospital's negligent credentialing practices only occurs where the patient has been apprised that his or her doctor "may have committed a number of harmful, improper or unwarranted surgeries upon a number of unsuspecting patients such that [a hospital's] credentialing practices could reasonably be brought into question." I disagree and would hold, contrary to the majority opinion, that the plaintiffs' causes of action against SEMC could accrue even without notice that other former patients were suffering from similar conditions.

{¶ 82} One is not left to imagine the purpose SEMC had in supplying this form letter to patients about to undergo Dr. Burt's unusual surgery. SEMC was clearly attempting to insulate itself from liability. In doing so, the hospital was telling its patients that Dr. Burt's specific brand of reconstruction surgery was unlike any other known form of reconstruction surgery. The experimental nature of this surgery therefore carried with it additional risks not associated with standard and generally accepted surgical procedures. Because it is not before this court, we leave unresolved the issue whether the hospital can effectively assert this letter as a defense to the Browning and Mitchell lawsuits. However, the letter's relevance in placing these former patients on notice that SEMC itself may have breached a duty owed to them by allowing such surgeries to be performed on its premises should not likewise go unresolved.

{¶ 83} If the majority properly applied *Allenius* and *Flowers* to these facts, the conclusion would be that the form letter was effective to place both Browning and Mitchell on notice that SEMC may have failed to properly perform its credentialing duties by permitting a physician's questionable surgical procedures.

The next question to be answered is when the statute of limitations began to run on the patients' negligent credentialing causes of action against SEMC. Obviously, the statute did not begin to run when Browning and Mitchell were supplied with the form letter because the surgeries had yet to be performed and they, therefore, could claim no resulting injury. Since they had no reason to believe they were harmed, it is equally unfair to hold that the statute of limitations was triggered when the operations were first performed. In medical malpractice cases, the running of the statute of limitations is delayed from the traditional date of injury to the date a "cognizable event" is discovered, in order to eliminate unfairness to medical malpractice plaintiffs. *See Flowers*, *supra*, 63 Ohio St.3d at 550, 589 N.E.2d at 1288. Accordingly, it was not until Browning and Mitchell became aware that the injuries they complained of were related to the doctors' surgeries that they should have appreciated the significance of the hospital's form letter. *Allenius* clearly envisions and requires that the patient investigate and pursue all "possible remedies" once he or she has been put on notice by the cognizable event. *See Allenius*, 42 Ohio St.3d 131, 538 N.E.2d 93, syllabus.

{¶ 84} Among the "possible remedies" of a plaintiff harmed by the malpractice of a physician are claims against a hospital for negligent credentialing procedures when that patient has information of circumstances sufficient to put a reasonable person on inquiry that the hospital may have breached a duty owed to him or her. At the time their causes of action against the doctors accrued, the form letter provided notice to plaintiffs of a possible claim against SEMC or at least should have alerted them to the need to investigate such claim.

{¶ 85} In case No. 91-2079, Browning informed Dr. Blue at the latest in August 1987 that he had committed malpractice on her. By that time, Browning had undergone approximately sixteen surgeries and her physical and emotional health was continuing to decline. The trial court, therefore, correctly found that August 1987, at the very latest, was the time when Browning was put on notice by

a "cognizable event" to pursue her medical malpractice claim and the one-year statute of limitations of R.C. 2305.11 began to run. To hold otherwise is to cast aside the "cognizable event" test this court announced just four years ago in an effort to give trial courts some useful standard in medical malpractice cases. Because Browning should also have been aware of SEMC's negligence in permitting her doctor's experimental surgery, her cause of action against the hospital for negligent credentialing and retention also accrued on this date. Both causes of action were barred because Browning filed her complaint on April 17, 1989, outside the one-year period of limitations.

{¶ 86} In case No. 91-2121, Mitchell underwent Dr. Burt's reconstruction surgery in January 1985. The medical problems to be alleviated by this surgery (which included urinary incontinence, bladder and vaginal infections and painful sexual intercourse) actually worsened within a few months after the January 1985 surgical procedure. The record indicates that by mid-1985, intense pain and massive vaginal bleeding made it impossible for Mitchell to engage in sexual intercourse with her husband. Mitchell was also aware of the unusual appearance of her vagina at this time. She discovered that her vagina "was covered over" and "sewn up." Certainly, these occurrences gave rise to a "cognizable event" for purposes of Mitchell's discovery of her medical malpractice claim. Like Browning, the SEMC form letter could reasonably be expected to place Mitchell on notice of the need to pursue her "possible remedy" against the hospital. Since Mitchell's complaint against the hospital was filed more than three years after she was placed on notice, the trial court correctly found it was time-barred.

{¶ 87} For the foregoing reasons, I would reverse the judgment of the court of appeals as it relates to the claims of plaintiffs against SEMC and reinstate the grants of summary judgment by the trial court.

COOK, J., concurs in the foregoing opinion.

———————————

**WRIGHT, J., concurring in part and dissenting in part.**

**{¶ 88}** Along with the Chief Justice, I agree with the majority's disposition of Lawrence Browning's consortium claim, but disagree with the majority's disposition of the plaintiffs' negligent credentialing claims against St. Elizabeth Medical Center. Unlike the Chief Justice though, because I believe a *negligent* credentialing claim is necessarily grounded in negligence, I agree with the majority's holding in paragraph three of the syllabus that "[a]n action against a hospital for bodily injury arising out of the negligent credentialing of a physician is subject to the two-year limitations period set forth in R.C. 2305.10."

**{¶ 89}** However, I find it completely unnecessary to create a new event, the "alerting event," as the accrual date for the running of the statute of limitations. The "cognizable event" which we recognized in *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 538 N.E.2d 93, the event by which "'the patient discovers, or, in the exercise of reasonable care and diligence should have discovered, the resulting injury,'" is the event which "place[s] the patient on notice of the need to pursue his possible remedies." *Id.* at 133, 538 N.E.2d at 95, and at syllabus (quoting, in part, *Oliver v. Kaiser Community Health Found.* [1983], 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438, paragraph one of the syllabus). One of the "possible remedies" of which the plaintiff is on notice is a negligent credentialing claim.

**{¶ 90}** I certainly agree with the majority that not every case of malpractice will give rise to a negligent credentialing claim. However, as the Chief Justice points out, every negligent credentialing claim will by necessity arise out of a malpractice claim because the plaintiff must have been injured by the hospital's actions in negligently credentialing the physician in question. Therefore, it seems to me that the cognizable event which is the accrual date for a malpractice action is the same point in time at which, as the majority writes, the "plaintiff discovers or, through the exercise of reasonable diligence, should have discovered some

definative information that would reasonably warrant *investigation* of the hospital's credentialing practices."  (Emphasis added.)

**{¶ 91}** I disagree with the majority that use of this cognizable event to trigger the statute of limitations for a negligent credentialing claim will "encourage baseless claims of negligent credentialing and a hospital would be named in nearly every lawsuit involving the malpractice of a physician."  The majority overlooks the fact that the malpractice action has a one-year limitations period while the negligent credentialing claim will have a two-year limitations period.  This allows plaintiffs additional time to investigate whether the injury caused by the malpractice was a result of the hospital's negligent credentialing of the physician.

**{¶ 92}** My view of the record is that the "cognizable event" as to both appellees with respect to the hospital took place at a far earlier time than the television show described by the majority.  Accordingly, I would remand the matter to the trial court to determine the precise time frames involved.