[Cite as *Haskins v. 7112 Columbia, Inc.*, 2016-Ohio-5575.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| DAVID HASKINS, CO-ADMINISTRATOR OF THE ESTATE OF MINNIE HASKINS, | ) ) ) | |
| PLAINTIFF-APPELLANT. | ) ) | CASE NO. 15 MA 0192 |
| V. | ) ) | OPINION |
| 7112 COLUMBIA, INC., DBA VALLEY RENAISSANCE HEALTH CARE CENTER, | ) ) ) ) | |
| DEFENDANT-APPELLEE. | ) ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 12CV2834

JUDGMENT:     Affirmed

APPEARANCES:
For Plaintiff-Appellant     Attorney Andrew L. Johnson, Jr.
6809 Mayfield Road, Suite 570
Mayfield Heights, Ohio 44124

For Defendant-Appellee     Attorney Ernest W. Auciello
Attorney Susan M. Audey
Attorney John A. Favret, III
950 Main Avenue, Suite 1100
Cleveland, Ohio 44113-7213

JUDGES:

Hon. Gene Donofrio
Hon. Mary DeGenaro
Hon. Carol Ann Robb

Dated: August 22, 2016

DONOFRIO, P.J.

{¶1} Plaintiff-appellant, Crystal Haskins, co-administrator of the Estate of Minnie Haskins, appeals from a Mahoning County Common Pleas Court judgment granting summary judgment in favor of defendant-appellee, 7112 Columbia, Inc., d.b.a. Valley Renaissance Health Care Center.

{¶2} Minnie Haskins was admitted to Valley Renaissance Health Care Center on January 15, 2010. Minnie was bedridden and weighed 300 to 400 pounds. On or about July 25, 2011, two state tested nursing assistants (STNAs) were changing the bed linens on Minnie's bed. Minnie was in bed at the time. The STNAs had to "turn" Minnie in order to remove the bed sheets. While they were turning her, Minnie heard a "pop." She subsequently complained of pain in her leg. Several days later, Minnie was taken to the hospital where x-rays revealed she had a broken femur. Minnie returned to Valley Renaissance after her hospital stay. She passed away there on March 6, 2012.

{¶3} On September 10, 2012, David Haskins, Minnie's son and the co-administrator of her estate, filed a complaint against appellee. The complaint alleged that on or about July 25, 2011, when the STNAs attempted to move Minnie to change her bed linens, they broke her left leg.

{¶4} Appellee raised numerous defenses, one of which was that the one-year statute of limitations for medical claims had run. The trial court dismissed the complaint on this basis. David appealed to this court. We found that based solely on the pleadings at that stage of the proceedings, appellant's claim could be construed as a general negligence claim, which has a two-year statute of limitations. *Haskins v. 7112 Columbia, Inc.*, 7th Dist. No. 13 MA 100, 2014-Ohio-4154, 20 N.E.3d 287, ¶ 19. Therefore, we reversed the dismissal and remanded the matter to the trial court. *Id.*

{¶5} After the case was remanded, David passed away. His sister, Crystal Haskins, was substituted as the plaintiff-appellant in this case.

{¶6} Appellee then filed a motion for summary judgment. Appellee again asserted that appellant's claim was time-barred by the one-year statute of limitations for medical claims. It asserted the act of turning Minnie to change her bed linens was

a necessary part of her medical care and, therefore, appellant's claims were medical claims under R.C. 2305.113(E)(3) subject to the one-year statute of limitations. This time, however, appellee submitted evidence in support of its allegation.

{¶7} Appellant filed a response in opposition. She asserted that her claim was not a medical claim but instead was a negligence claim, which is governed by a two-year statute of limitations.

{¶8} The trial court granted appellee's motion for summary judgment. It found there was no genuine issue of material fact that appellant's claim was a medical claim that should have been brought within one year from the date of the alleged injury. It found appellant's claim arose from Minnie's medical care and treatment. And it found appellant's complaint was filed after the one-year statute of limitations expired. Therefore, the court granted appellee's summary judgment motion and dismissed the complaint.

{¶9} Appellant filed a timely notice of appeal on October 26, 2015. Appellant raises three assignments of error.

{¶10} Appellant's first assignment of error states:

THE TRIAL COURT ERRED BY GRANTING DEFENDANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT.

{¶11} Appellant argues a genuine issue of material fact surrounds whether, under the statutory definition of "medical care," the STNAs were performing nursing care or medical care when they were turning Mrs. Haskins and changing her bed sheets. She points to several instances where appellee refers to the turning at issue as "nursing medical care." Appellant claims that "nursing medical care" refers to medical care performed by nurses, which she asserts is governed by a two-year statute of limitations.

{¶12} Appellant goes on to argue there is no evidence that a doctor provided a medical diagnosis along with a care or treatment plan for Minnie that included turning her when changing her bed linens. Instead, the care plan produced by

appellee was prepared and executed by appellee's nurses. Moreover, appellant cites to the affidavit of Dr. Janet Morgan who opined that when the STNAs turned Minnie it was not medical care or treatment, but was a careless act in violation of the training on how to change a bedridden patient's sheets. (Morgan Aff. ¶ 4).

**{¶13}** An appellate court reviews the granting of summary judgment de novo. *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. Thus, we shall apply the same test as the trial court in determining whether summary judgment was proper.

**{¶14}** A court may grant summary judgment only when (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) the evidence can only produce a finding that is contrary to the non-moving party. *Mercer v. Halmbacher*, 9th Dist. No. 27799, 2015-Ohio-4167, ¶ 8; Civ.R. 56(C). The initial burden is on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact as to the essential elements of the case with evidence of the type listed in Civ.R. 56(C). *Dresher v. Burt*, 75 Ohio St .3d 280, 292, 662 N.E.2d 264 (1996). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts to show that there is a genuine issue of material fact. *Id*.; Civ.R. 56(E). "Trial courts should award summary judgment with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party." *Welco Industries, Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 346, 1993-Ohio-191, 617 N.E.2d 1129.

**{¶15}** The statute of limitations for a medical claim is one year from the date the action accrued. R.C. 2305.113(A). In contrast, the statute of limitations for a negligence action is two years from the date the action accrued. R.C. 2305.10. The issue of which statute of limitations applies to a particular cause of action presents a question of law. *Potter v. Cottrill*, 4th Dist. No. 11CA685, 2012-Ohio-2417, ¶ 9; *Simmons v. Ohio Rehab. Serv. Comm.*, 10th Dist. No. 09AP-1034, 2010-Ohio-1590, ¶ 3. Thus, which statute of limitations applies is a legal question for the court to determine.

**{¶16}** Appellant's claim was filed past the one-year statute of limitations for medical claims but within the two-year statute of limitations for negligence claims. Thus, if appellant's claim is a medical claim, it is barred by the statute of limitations and summary judgment was proper. If it is not a medical claim but instead is a general negligence claim, it is not barred by the statute of limitations and summary judgment was inappropriate. Thus, we must determine whether appellant's claim is a medical claim.

**{¶17}** Pursuant to the version of R.C. 2305.113(E)(3) that was in effect at the time the claim accrued, a medical claim is

> any claim that is asserted in any civil action against a physician, podiatrist, hospital, home, or residential facility, against any employee or agent of a physician, podiatrist, hospital, home, or residential facility, or against a licensed practical nurse, registered nurse, advanced practice registered nurse, physical therapist, physician assistant * * *, and that arises out of the medical diagnosis, care, or treatment of any person.

**{¶18}** Medical claims also include:

> (a) Derivative claims for relief that arise from the plan of care, medical diagnosis, or treatment of a person;
>
> (b) Claims that arise out of the plan of care, medical diagnosis, or treatment of any person and to which either of the following applies:
>
> (i) The claim results from acts or omissions in providing medical care.
>
> (ii) The claim results from the hiring, training, supervision, retention, or termination of caregivers providing medical diagnosis, care, or treatment.
>
> (c) Claims that arise out of the plan of care, medical diagnosis, or

treatment of any person and that are brought under section 3721.17 of the Revised Code.

R.C. 2305.113(E)(3).[1]

{¶19} Under R.C. 2305.113(E)(14), the word "home" includes a nursing home. There is no dispute here that appellee is a nursing home under the statutory definition.

{¶20} In the previous appeal in this case, we found that at the pleading stage, there was "no indication from [the] record in this case that changing Minnie's sheets was part of some type of medical test or procedure, was ordered by a doctor, or that it required any medical expertise or professional skill." *Haskins*, 2014-Ohio-4154, at ¶ 18. Yet we recognized it was possible that appellee "through the use of evidence at some later stage of the proceedings" might be able to prove that this case involved a medical claim subject to the one-year statute of limitations. *Id.* Thus, we left open the possibility that this case asserted a medical claim.

{¶21} The parties submitted the affidavits and depositions of Kimberly Floyd and Dr. Morgan.

{¶22} Kimberly Floyd was Minnie's son's girlfriend. She is also an STNA at a different nursing home. In her affidavit, Floyd stated that on August 2, 2011, she visited Minnie in the hospital. (Floyd Aff. ¶ 4). Minnie told Floyd that two female staff members employed by appellee had come into her room to change her sheets while she was lying on her back. (Floyd Aff. ¶ 5). Minnie told Floyd that one sheet was stuck under the weight of her body so one of the women grabbed her left leg and threw it over and onto her right leg and she heard a "pop" in her left leg. (Floyd Aff. ¶ 5). David Haskins also submitted an affidavit before his death averring to these same facts.

{¶23} In her deposition, Floyd stated that Minnie suffered from numerous

---

1 R.C. 2305.113(E)(3) was amended on March 23, 2015, to include in the definition of a "medical claim," "Claims that arise out of skilled nursing care or personal care services provided in a home pursuant to the plan of care, medical diagnosis, or treatment." R.C. 2305.113(E)(3)(d). But this subsection was not added until three and a half years after the cause of action accrued.

health issues including high blood pressure, heart disease, a tracheotomy, obesity, and incontinence. (Floyd Dep.19-22). Floyd understood that part of Minnie's care plan was that the STNAs and nurses were to change her if she had a bowel movement, clean her, assess her for skin breakdown, and turn and reposition her. (Floyd Dep. 23-24). Floyd stated that when she and David went to visit Minnie on August 2, 2011, Minnie told them that an STNA was in the process of changing her sheets and the STNA took Minnie's left leg and threw it over causing Minnie to hear a noise and call out to the STNA that she just broke her leg. (Floyd Dep. 33).

{¶24} Floyd also testified that during her STNA training, she was taught how to properly turn a patient to change their bed linens. (Floyd Dep. 14-16). She stated that this was a task for STNAs or nurses, as opposed to a housekeeping task. (Floyd Dep. 15, 17-18). Floyd also testified that turning and changing an incontinent patient is part of the patient's care plan. (Floyd Dep. 18).

{¶25} Dr. Morgan is appellant's expert witness. In her affidavit, she opined that the nursing home staff breached the standard of care when changing Minnie's bed linens and "throwing" her leg over her other leg to turn her. (Morgan Aff. ¶ 2). Dr. Morgan averred that when the nursing home staff grabbed Minnie's left leg and threw it over her right leg, fracturing her femur, "it was not medical care or treatment." (Morgan Aff. ¶ 4). Instead, it was a "careless act * * * in violation of the instructions and training nurse assistants receive on how to change the sheets on a bedridden patient's bed." (Morgan Aff. ¶ 4).

{¶26} Dr. Morgan stated that she is generally familiar with nursing care plans, which outline the nursing medical care to be provided to a patient. (Morgan Dep. 22). She agreed that a nursing care plan could include various interventions to treat the patient's medical conditions and to either prevent or alleviate the patient's physical defects. (Morgan Dep. 22). Dr. Morgan also agreed that nurses and STNAs acquire professional expertise through education and clinical training which they execute pursuant to nursing care plans. (Morgan Dep. 23). And she agreed that both nurses and STNAs must pass state boards in order to practice their professions. (Morgan

Dep. 24).

**{¶27}** Dr. Morgan then went through Minnie's care plan. (Morgan Dep. 24; Ex. 3). She acknowledged various aspects of Minnie's care plan including that Minnie was totally dependent on the staff for transfers because she was bedridden, she was incontinent of bowel and bladder and required incontinence care, she required skin care cream to prevent skin breakdown and infections from the incontinence, and she was required to be repositioned every two hours. (Morgan Dep. 25-27). Dr. Morgan agreed that these items were part of Minnie's nursing medical care. (Morgan Dep. 27). Dr. Morgan also acknowledged that Minnie's care plan provided for assistance with turning and repositioning as needed and incontinence care as needed. (Morgan Dep. 27-28).

**{¶28}** Dr. Morgan agreed that turning and repositioning an immobile patient is performed to prevent skin breakdown, pressure ulcers, and infections. (Morgan Dep. 29-30). She agreed that turning and repositioning an immobile patient is also performed to alleviate pressure and pain associated with immobility. (Morgan Dep. 30). Dr. Morgan further agreed that, due to Minnie's medical conditions, appellee's nursing care plan of turning and repositioning Minnie was meant to prevent skin breakdown, pressure ulcers, and infections as well as to alleviate any pressure and pain resulting from her immobility. (Morgan Dep. 30, 31). Dr. Morgan also agreed that this intervention performed by the nursing staff was medical care. (Morgan Dep. 30).

**{¶29}** Dr. Morgan also discussed incontinence care. She stated that incontinence care is provided to prevent skin breakdown and ulceration as well as to alleviate the patient's discomfort. (Morgan Dep. 32). She agreed that incontinence care involved changing the patient's clothing and bed sheets, cleaning the skin, assessing the skin for breakdown, and providing various ointments. (Morgan Dep. 32). Dr. Morgan agreed that incontinence care for a bedridden patient also involved maneuvering or turning the patient in order to provide the needed care. (Morgan Dep. 33).

**{¶30}** Significantly, Dr. Morgan agreed that on July 25, 2011 (the day of the alleged injury), turning Minnie to change her was a necessary part of her incontinence care and a necessary part of Minnie's overall nursing medical care. (Morgan Dep. 34). Dr. Morgan agreed that this intervention was care-planned for and was part of Minnie's nursing medical care. (Morgan Dep. 34).

**{¶31}** Finally, Dr. Morgan discussed STNAs' and nurses' training. She agreed that when turning or maneuvering a patient in a bed like Minnie, the nursing staff has to follow what they have been trained to do or risk injuring the patient. (Morgan Dep. 35). And she agreed that when turning a patient such as Minnie, the STNAs would have to have special training and professional experience. (Morgan Dep. 35-36).

**{¶32}** The Ohio Supreme Court has observed that not all claims asserted against a hospital are "medical claims" subject to the one-year statute of limitations. *Browning v. Burt*, 66 Ohio St.3d 544, 556-557, 1993-Ohio-178, 613 N.E.2d 993. A claim is a "medical claim" within the meaning of the statute "only if the claim arises out of the medical diagnosis, care, or treatment of a person." *Id.* at 557.

**{¶33}** The Ohio Supreme Court also examined what constitutes a "medical claim" in *Rome v. Flower Mem. Hosp.*, 70 Ohio St.3d 14, 1994-Ohio-43, 635 N.E.2d 1239. *Rome* dealt with two separate cases involving potential medical claims. In one case, the Court concluded that the process of securing the patient to a radiology table "is ancillary to and an inherently necessary part of the administration of the X-ray procedure which was ordered to identify and alleviate her medical complaints." *Id.* at 16. Additionally, the Court found that at the time of the injury the patient was being assisted by an employee of the hospital who was required to exercise a certain amount of professional expertise in preparing the patient for X-ray. *Id.* Thus, the Court found a medical claim existed. In the second case, the Court found the transport of a patient from physical therapy "was ancillary to and an inherently necessary part of his physical therapy treatment." *Id.* Again the Court also found that at the time of the alleged injury the patient was assisted by a hospital employee

who was required to use a certain amount of professional skill in transporting the patient in the wheelchair. *Id.* at 16-17. So once again, the Court found a medical claim existed.

**{¶34}** In the previous appeal of this case, where we found that on the pleadings this was not a medical claim, we set out several facts that distinguished this case from *Rome*:

> The complaint in this case does not indicate that the two people changing the sheets had any particular medical expertise or skill. The complaint does not indicate that Minnie was involved with or was being prepared for any particular medical procedure. Although it is possible that changing bed linens had some medical purpose, there are also a variety of possible non-medical reasons that the sheets were changed the day Minnie was injured. The fact that Minnie weighed 300-400 pounds, was bedfast and could not walk or get out of bed on her own, might be relevant facts at that time, but they are not determinative at this stage. We must point out that *Rome* was decided on summary judgment, where the parties were able to submit actual evidence in support of their argument. The instant appeal involves a judgment on the pleadings, and all inferences from those pleadings must be read in favor of Appellant, the nonmoving party. It is apparent to us that the inferences that can be drawn solely from the pleadings support Appellant's argument.

*Haskins*, 2014-Ohio-4154, at ¶ 15.

**{¶35}** The facts of this case have changed since the matter was last before us. This case no longer involves a judgment on the pleadings. Instead, this matter was decided on summary judgment, as was *Rome*, and the parties have had the opportunity to submit evidence in support of their positions.

**{¶36}** The depositions indicate that the STNAs changing the sheets had to

have had certain expertise and skill. Both witnesses testified that STNAs must be trained and state-licensed. (Floyd Dep. 8; Morgan Dep. 24). Moreover, they both stated that changing Minnie's bed linens was not a housekeeping matter but instead required certain skill and experience. (Floyd Dep. 14-18; Morgan Dep. 23, 35-36).

**{¶37}** Importantly, the depositions provided that changing the bed linens on the day in question did have a medical purpose. Dr. Morgan agreed that turning Minnie to change her was a necessary part of her incontinence care and a necessary part of her overall nursing medical care. (Morgan Dep. 34). Dr. Morgan agreed that this intervention was care-planned for and was part of Minnie's nursing medical care. (Morgan Dep. 34). Dr. Morgan testified that incontinence care includes changing the patient's clothing and bed sheets. (Morgan Dep. 32). And Dr. Morgan agreed that these measures were necessary to prevent skin breakdown and ulceration as well as to alleviate discomfort. (Morgan Dep. 32).

**{¶38}** The witnesses' testimony clearly indicates that the turning and changing of Minnie's bed linens on the day in question was "ancillary to and an inherently necessary part of" her incontinence care. Appellant's own expert agreed that turning Minnie to change her sheets was a necessary part of her incontinence care and a necessary part of Minnie's overall nursing medical care. And she agreed that this intervention was care-planned for and was part of Minnie's nursing medical care.

**{¶39}** Based on the above, the trial court properly concluded that appellant's claim here is a medical claim subject to the one-year statute of limitations. Therefore, summary judgment was proper.

**{¶40}** Accordingly, appellant's first assignment of error is without merit.

**{¶41}** Appellant's second assignment of error states:

THE TRIAL COURT ERRED WHEN IT FAILED TO FIND THAT THE CARELESS, NEGLIGENT, FRACTURING OF MRS. HASKINS' FEMUR BONE BY DEFENDANT-APPELLEE'S NURSE WAS A NEW, SEPARATE AND DISTINCT ACT THAT DID NOT ARISE OUT OF ANY MEDICAL DIAGNOSIS, CARE, OR TREATMENT OF MRS.

HASKINS.

{¶42} Here appellant argues a genuine issue of material fact exists as to whether a doctor ever rendered a medical diagnosis concerning Minnie's health conditions and her care and treatment that included turning her to change her bed linens. Instead, appellant again argues this was nursing care, not medical care.

{¶43} Appellant attempts to make distinction here between "medical care" and "nursing medical care." But there is no basis for such a distinction. R.C. 2305.113(E)(3) defines a "medical claim" as "any claim that is asserted in any civil action against a * * * home, or residential facility, against any employee or agent of a * * * home, or residential facility * * * and that arises out of the medical diagnosis, care, or treatment of any person." Nothing in the statute differentiates between care provided by a nurse and care provided by a physician. And as will be discussed in appellant's third assignment of error, medical claims can be asserted against all types of employees working in hospitals and nursing homes.

{¶44} Accordingly, appellant's second assignment of error is without merit.

{¶45} Appellant's third assignment of error states:

THE TRIAL COURT ERRED BY ITS CONCLUSION STATED IN ITS JUDGMENT ENTRY THAT "EVIDENCE SHOWS THAT PLAINTIFF'S CLAIMS AROSE FROM THE MEDICAL CARE AND TREATMENT THAT VALLEY RENAISSANCE HEALTH CARE CENTER PROVIDED TO MINNIE HASKINS ON JULY 25, 2011."

{¶46} In her final assignment of error, appellant asserts there is a genuine issue of material fact as to whether Minnie had any claim that arose from her medical care and treatment. Appellant once again cites to appellee's counsel's statements that the STNAs were providing "nursing medical care" when they turned Minnie. She claims these statements are concessions on appellee's part that this case does not involve a "medical claim" within the meaning of the statute.

{¶47} Appellant seems to argue here that medical care provided by a nurse cannot result in a medical claim. This is simply not true. Many cases have found medical claims to exist when the care has been provided by various health care employees including hospital transport personnel (*Rome*, 70 Ohio St.3d 14); nurses and orderlies (*Long v. Warren Gen. Hosp.*, 121 Ohio App.3d 489, 700 N.E.2d 364 (11th Dist.1997)); and radiology technicians (*Taylor v. Meridia Huron Hosp.*, 8th Dist. No. 80121, 2002-Ohio-3449). Thus, the fact that the actions in this case were undertaken by nurses or STNAs has no bearing on whether the case involves a medical claim.

{¶48} Accordingly, appellant's third assignment of error is without merit.

{¶49} For the reasons stated above, the trial court's judgment is hereby affirmed.

DeGenaro, J., concurs.

Robb, J., concurs.